ELIAB A. CONVERSE AND ANOTHER *vs.* THE NORWICH AND NEW YORK TRANSPORTATION COMPANY.

The defendants were a joint-stock corporation organized for the purpose of conducting the business of common carriers by water between *N* and *L.* They had made a contract with a railroad company, whose line ran from *L* to *S,* by which it was agreed that their boats should run daily in connection with certain trains upon the railroad, that *through-freight* received for transportation over the routes of both companies should be carried at reduced rates, that the receipts from such freight should be divided in certain proportions between them, that the railroad company should build a wharf and depot in *L,* where both companies could transact their freight business, the defendants paying a rent for their use of it, and which contained other minor provisions directed to the same gen-

eral purpose of securing a *through-freight* business for the benefit of both. Goods having been shipped at *N* for transportation to *S*, the defendants gave a written receipt for them as received "on board the Norwich and Worcester boat, bound for *S.*" Held, that in the absence of further evidence of an express contract, the defendants were only bound to carry the goods to *L*, and there deliver them to the railroad company.

Held also that their liability was not affected by the fact that there was a usage between the companies, which was known to the owner of the goods, that in such cases a single bill for the amount of the freight from *N* to *S* should be made out by the defendants, and collected and receipted by the agent of the railroad company at *S* on delivery.

The question whether the mere receipt of goods by a common carrier marked for and destined to a place beyond the terminus of his route, is *prima facie* evidence of a contract to carry to the place of destination, is not now an open one in this state.

Whether a contract to carry the goods to *S*, if proved, could be sustained as within the corporate powers of the defendants :—*Quære.*

The case of *Hood* v. *N. York & N. Haven R. R. Co.*, 22 Conn. 1, and 502, considered.

The railroad company and steamboat company had a covered wharf in common at their common terminus used both as a depot and wharf, and it was the established usage for the steamboat company to land goods for the railroad on the arrival of its boats in the night, upon a particular place in the depot, where they were taken by the railroad company the next morning, both companies having equal possession of the depot. Freight received by the steamboat company for delivery to the railroad company was landed in the depot and at the place in question during the night of Saturday, and was burned with the depot in the afternoon of Sunday following, the railroad company having done no act in the mean time accepting delivery. Held, that the steamboat company had delivered the goods and was not liable for the loss of them.

THIS was an action of special assumpsit, charging the defendants in one count with a failure to deliver at Stafford a quantity of wool which had been entrusted to and received by them as common carriers between the city of New York and Stafford ; and in a second count alleging that they were common carriers between New York and New London, and as such received the goods in question for delivery to the New London Northern Railroad Company at New London, but that they had failed so to deliver them. The case was tried to the jury in the superior court upon the general issue, before *Park, J.*

On the trial the plaintiffs produced a receipt which it was admitted, was given to them by the defendants and read as follows :—

"New York, May 7th, 1864.

Received from John M. Pendleton & Co., in good order, on board the Norwich and Worcester Boat, bound for Stafford, Ct., the following packages :

   Marks   Sixty-two (62) Bales Wool, 11,756 lbs.
    A

E. A. Converse & Son,         C. of B.
  Stafford, Ct.           Parker."

It was agreed by the parties that the wool mentioned in this receipt was taken on board the " City of Boston," one of the steamboats of the defendants, and carried to New London, and there landed and put into a depot building on the wharf during the night of Saturday May 7th, 1864, and that it was there destroyed by fire on the afternoon of Sunday, May 8th.

The plaintiffs also introduced an agreement, duly executed by the authorized agents of the contracting parties, of the following tenor :—

" This agreement entered into this 13th day of April, 1861, by the New London Northern Railroad Company on the one part, and the Norwich and New York Transportation Company on the other part, witnesseth as follows :—The said railroad company agrees to run one passenger train of cars from the steamboats of the said transportation company in New London to Palmer in the state of Massachusetts, and from Palmer to said steamboats in New London every day, (Sundays excepted,) making the best connection practicable for the interest of the line with all connecting roads ; also to run one freight train each way between Palmer and New London, connecting with said boats every day, (Sundays excepted ;) also to build and furnish a good and substantial wharf at New London on Water street, from the wharf of Samuel Hobron to that of Beckwith & Co. inclusive, amounting to about 591 feet front on the water, with suitable depot buildings, tracks, etc., on said wharf; the buildings for the depot to be not less than 300 feet by 60 feet ; and for the use of said wharf, depot, buildings, etc., the said transportation company and the Norwich and Worcester Railroad Company are to pay jointly to the New London Northern Railroad Company an annual rent of four thousand dollars, in equal quar-

terly payments. The said Norwich and New York Transportation Company agree, on their part, to run first-class passenger boats to and from the said wharf in New London to and from New York daily, except Sundays, in connection with said road, for freight and passengers; and to make New London the terminus for their passenger boats, and in connection with the Norwich and Worcester Railroad Company, they agree to pay the above named annual rent of four thousand dollars to the New London Northern Railroad Company. The said railroad company shall carry the passengers and freight delivered to them for that purpose by the boats of the said transportation company, and the said transportation company shall carry the passengers and freight delivered to them for that purpose by said railroad company, to the places of their destination on said line. And the expenses of agents and advertising the line in New York shall be paid by said transportation company, and the expenses of agents and advertising on the line of the said railroad and its connections shall be paid by the said railroad company. And both parties agree to use all proper exertions in their power to procure business for the line, and give the same the best possible dispatch, and so conduct the business in every particular as to promote the best interests of the line. Loss or damage occurring to property shall be borne by the party having the same in charge; but should any loss or damage occur and the fact can not be ascertained which party had the same in charge, then to be paid for by both parties in proportion to the amount received by them respectively for transportation of the same. The rates of division on freights and passengers between the two companies shall be as follows :—to and from all connecting roads beyond Palmer, after paying said roads, fifty per cent. to each company; to and from Palmer and all stations on the line of the New London Northern railroad above Willimantic, fifty per cent. to each company; to and from all stations on the line of the Hartford, Providence and Fishkill railroad, and the steamboats, fifty per cent. to the two roads and the same to the boats; on all freight to and from Willimantic, forty-five per cent. to the

railroad and fifty-five per cent. to the steamboats; and on all stations below Willimantic, to and from the boats, thirty per cent. to the railroad and seventy per cent. to the steamboats; on all passengers to and from Willimantic and stations below, the road to have their local rates, which, added to such prices as the transportation company shall furnish, shall be the through rates. A tariff of rates to and from all points on the line of the railroad shall from time to time be mutually agreed upon and fixed by the parties hereto, but the railroad company shall have the right to make such special contracts for the transportation of freight from stations on the line of their road as they may deem for the interest of the two companies, and the transportation company shall have the same right in New York; but if such special contracts are objected to by either party they shall not be renewed. The said railroad company further agree that they will make no arrangements with any other company, steam vessels or boats, during the term of this contract, for the transportation of freight or passengers; nor will they take freight or passengers to any other steam vessels or boats at less than local rates, which shall be at least twenty per cent. above their proportion on the joint tariff. Settlements shall be made daily between the contracting parties. This agreement shall be in force for ten years from the first day of July in the year 1861."

The following freight-bill, and several others of similar character, the earliest dated March 22d, 1864, and the latest May 11th, 1864, were also laid in.

### STEAMER.

Mr. E. A. C. & Son, Dr.           Mar. 12, 1864.

For transportation of merchandise from New York to Stafford, via New London.

| | Weight. | Cubic F't. | Expenses. | Stm'r Fr't. | R. R. Fr't. | Total Am't. |
|---|---|---|---|---|---|---|
| 2 Bales Extract, | 1190 | - | - | - | - | 4  17 |
| 3 " " | 1774 | - | - | - | - | 6  21 |
| 4 " " | 1758 | - | - | - | - | 6  15 |
| | 4722 | | | | | 16  53 |

Received Payment,    Tappan.

Converse *v.* Norwich & N. York Transportation Co.

It was admitted that these bills had been paid by the plaintiffs for freight on goods transported from New York to Stafford by the defendants and the New London Northern Railroad Company, and that the two companies were conducting their freight business according to the provisions of the above agreement at the time of the fire. The plaintiffs then introduced several witnesses, who testified at great length as to the business relations and usages between the defendants and the railroad company respecting the mode of delivering freight by one to the other, and their use of the depot building.

The defendants in reply adduced the testimony of several other witnesses upon the same points, but as a detailed statement of the evidence on both sides would occupy much space and is not necessary to explain the opinion of the court, it is omitted.

.It sufficiently appeared from the evidence that the goods in question were deposited by the defendants in the usual place of deposit for freight brought by them and destined for points on the line of the railroad, and that the common course of business in regard to such freight was for the defendants' agents to make out a way-bill of the several articles brought on each trip, and hand it to the agents of the railroad at New London, shortly after the arrival of the boat; that the latter loaded the freight on board their cars, taking it from the place where the defendants were accustomed to deposit it, and checked each article upon the way-bill as it was taken up; and that, if any article described in the way-bill was not found or was found in bad order, the defendants were accustomed and expected to look it up or put in good condition. It appeared also that in case of through freight received by the defendants in New York, the clerk of the boat transporting it was accustomed to make out a bill for the whole freight upon each parcel against the consignee, in the form of those laid in by the plaintiffs, and hand them with the way-bill to the agent of the railroad company at New London. The latter would then forward the bill with each parcel of freight to the railroad agent at the place of destination, and the latter

would receive payment and receipt the bill. The amount due to the defendants on such through freight, for its transportation to New London, would be paid to them by the railroad company.

The defendants laid in also the charter of the New London Northern Railroad Company, and a copy of their own articles of association as a joint stock company, on file in the office of the secretary of the state, dated July 14th, 1860, and containing the following statement of the purposes for which the corporation was formed :—" The business of said corporation shall be the transportation of mails, freight and passengers between New York and New London and Norwich, or other places, and for this purpose it shall have power to build or purchase such steamboats, propellers, or other vessels as may be required, and to purchase and hold such real and personal estate as may be necessary for said business."

The defendants claimed, and requested the court to charge the jury, that they had no power by their articles of association, to make the contract set forth in the first count of the plaintiffs' declaration, for the carriage of the goods from New York to Stafford, and that if such a contract was in fact made it was not binding upon them. The court did not so charge the jury, but charged them *pro forma* that the defendants had the power by their articles of association to make the contract. The defendants also claimed and requested the court to charge the jury, that if the goods of the plaintiffs were not delivered to the New London Northern Railroad Company until they were checked by that company upon the way-bill and put into their cars, they were held by the defendants, after they were deposited in the depot in the customary manner, not as common carriers but as warehousemen, and that therefore the defendants were not liable in this action. The court omitted to give the charge requested.

The jury returned a verdict for the plaintiffs, and the defendants thereupon moved for a new trial, on the ground of error in the charge of the court respecting their corporate powers, and also in the omission to charge as requested, and because the verdict was against the evidence in the cause.

*C. Chapman* and *Halsey*, with whom were *Hovey* and *West*, in support of the motions.

*First.* The verdict is against the evidence on the first count.

1. The defendants and the New London Northern Railroad Company were not in partnership. Neither had any interest in the property or business of the other. Each received pay for their own work, paying their own expenses, and employing and controlling their own agents. The only authority given to one company to bind the other is in relation to special contracts, and in that case the action would be that of an agent. Beyond the terminus therefore of their established route, the defendants are not liable as common carriers in the absence of any special agreement. *Hood* v. *N. York & N. Haven R. R. Co.*, 22 Conn., 1; *Elmore* v. *Naugatuck R. R. Co.*, 23 id., 457; *Naugatuck R. R. Co.* v. *Waterbury Button Co.*, 24 id., 468; *Goold* v. *Chapin*, 20 N. York, 259; *Merrick* v. *Gordon*, id., 93; *Mohawk & Hudson R. R. Co.* v. *Niles*, 3 Hill, 162; *Van Santvoord* v. *St. John*, 6 id., 157; *Farmers & Mechanics' Bank* v. *Champlain Transportation Co.*, 18 Verm., 131; *S. C.*, 23 id., 186, 209; Story on Partnership, § 58 *a.*

2. There was no special agreement here proved to vary the implied contract. The receipt of the defendants is merely evidence that the goods were received by them to be transported according to the usual course of their business. *Elmore* v. *Naugatuck R. R. Co.*, supra; *Nutting* v. *Connecticut River R. R. Co.*, 1 Gray, 502.

3. As the contract for transportation was therefore to New London only, there is a fatal variance between the proof and the allegations, which are of a contract to carry to Stafford. The *termini* of the route are material, as descriptive of the extent of the defendants' liability. Angell on Carriers, 449, 462; 2 Greenl. Ev., § 209.

4. A contract to transport goods as common carriers to Stafford, would be beyond the defendants' powers. The law requires the purposes for which a joint stock corporation is established to be stated in their articles of association, and declares any diversion of their operations or funds to other purposes to

be unlawful, unless in case of a formal change of the objects proposed in the manner prescribed by statute. Revision of 1866, p. 170, sec. 395, p. 173, sec. 409.

But the transportation business of the defendants was to be performed by water ; the places named were situated on the water, and the means of transportation were to be " steamboats, propellers and other vessels." Carriage by land formed no part of the purposes set forth in their articles. *Hood* v. *N. York & N. Haven R. R. Co.*, and *Naugatuck R. R. Co.* v. *Waterbury Button Co.*, supra. The doctrine sanctioned by these cases, involving the powers of chartered corporations, applies with greater force to the case of joint stock companies. The restriction upon corporations of the former class is by implication ; with those of the latter it is a positive statute prohibition.

*Second.* The verdict is against the evidence on the second count.

1. It is admitted that the defendants deposited the goods in the depot in the usual place for freight brought by them for the railroad, and when so deposited they were delivered to the railroad company, and the defendants freed from any liability for their subsequent loss. *Merriam* v. *Hartford & New Haven R. R. Co.*, 20 Conn., 354 ; *Richardson* v. *Goddard*, 23 How., 38 ; Redfield on Railways, 249, 250, 251.

2. The facts as to the usual course of business being undisputed, the question whether a deposit of the goods, according to that course of business, constitutes a delivery, is a question of law, and the law favors immediate delivery to the next carrier. Redfield on Railways, 251, 260.

3. The difference in the rule of liability of the two corporations favors the idea of delivery on the deposit of the goods in the depot according to the usage. The defendants are exempted by the act of Congress of March 3d, 1851, from liability for loss by fire, not occasioned by design or neglect, at whatever time during the voyage it may occur, whether in the river or harbor or outside. See *Moore* v. *American Transportation Co.*, 24 How., 36. It would be unreasonable to put a construction upon the usage between the two companies

which would enlarge the liability of the defendants as carriers after the transit was ended.

4. The testimony in relation to the daily course of business of the railroad company and its agents, and their occupancy of the depot building, confirm the fact of delivery.

*Third.* The court erred in not charging the jury as requested, that if the goods were not actually to be considered as delivered when deposited in the depot, they remained·in the custody of the defendants, not as common carriers but as warehousemen, and that therefore they were not liable in this action. *Garside* v. *Trent & Mersey Navigation Co.*, 4 T. R., 581; *Norway Plains Co.* v. *Boston & Maine R. R. Co.*, 1 Gray, 276; *McCarty* v. *N. York & Erie R. R. Co.*, 30 Penn. S. R., 247. The declaration will not support a claim against the defendants as warehousemen, nor were it otherwise framed could they be held thus liable without showing negligence in their keeping of the goods, no proof of which has been adduced. See *McCarty* v. *N. York & Erie R. R. Co.*, supra.

*Hyde* and *Strong*, contra.

*First.* The defendants are liable upon their contract to carry the goods to Stafford.

1. A contract was proved to carry the goods from New York to Stafford, by their reception for transportation between those points, by the usage of the connecting companies particularly in making out and collecting through freight-bills, and by the terms and effect of the agreement of April 13, 1861. When a joint arrangement like that in evidence exists between common carriers, making a continuous line, the carrier receiving the freight is held liable for its loss on any part of the line. Redfield on Railways, 285; Edwards on Bailments, 504; *Najac* v. *Boston & Lowell R. R. Co.*, 7 Allen, 329; *Simkins* v. *Norwich & New London Steamboat Co.*, 11 Cush., 102; *Fairchild* v. *Slocum*, 19 Wend., 329; *Weed* v. *Saratoga & Schenectady R. R. Co.*, id., 537; *Cary* v. *Cleveland & Toledo R. R. Co.*, 29 Barb., 35; *Noyes* v. *Rutland & Burlington R. R. Co.*, 27 Verm., 110; *Illinois Central R. R.*

*Co.* v. *Copeland*, 24 Ill., 332 ; *Perkins* v. *Portland, Saco & Portsmouth R. R. Co.*, 47 Maine, 591 ; *Mytton* v. *Midland Railway Co.*, 4 Hurlst. & Nor., 615 ; *Coxon* v. *Great Western Railway Co.*, 5 id., 274 ; *Bristol & Exeter Railway Co.* v. *Collins*, id., 969.

2. The defendants had power to make such a contract. The court are not called upon to construe a legislative grant of corporate powers, but to construe the language of the defendants themselves in specifying the purposes of their organization, and the latter can not complain if that construction is accepted which they have given to their own language by their conduct. *Zabriskie* v. *Cleveland, Columbus & Cincinnati R. R. Co.*, 23 How., 381. The case of *Hood* v. *New York & New Haven R. R. Co.*, 22 Conn., 1, relied upon by the defendants, is not only contrary to the English authorities but to the whole current of decisions in this country, and has been severely criticised by the courts of several states. And even if this court are not disposed to reverse that decision, they will not extend it to a case like the present. *The People's Savings Bank* v. *Collins*, 27 Conn., 142 ; *Carey* v. *Cleveland & Toledo R. R. Co.*, and other authorities, supra.

*Second.* But if we are mistaken in the above positions the evidence shows that the freight had not been delivered to the railroad company when it was destroyed, and the defendants are therefore liable upon the second count. Carriers running in connection with each other so as to form a continuous or through line, are held liable as such until actual delivery to the next carrier in the line. Angell on Carriers, 73, 304 ; Edwards on Bailments, 507, 529, 530 ; Redfield on Railways, 260, 281 ; *Brentnall* v. *Saratoga & Whitehall R. R. Co.*, 32 Verm., 665 ; *Goold* v. *Chapin*, 20 N. York, 259 ; *Ladue* v. *Griffith*, 25 id., 364 ; *Miller* v. *The Steam Navigation Co.*, 13 Barb., 361. And the defendants did not become warehousemen merely by unloading goods in their depot at New London. The case of *Norway Plains Co.* v. *Boston & Maine R. R. Co.*, cited on the other side, and kindred decisions, apply only to the delivery of goods when arrived at their final destination. And even then that case is in conflict with the deci-

Converse *v.* Norwich & N. York Transportation Co.

sions in other states, and has not been adopted as the law of this state. *Moses* v. *Boston & Maine R. R. Co.*, 32 N. Hamp., 523 ; *Carey* v. *Cleveland & Toledo R. R. Co.*, supra; *Ouimit* v. *Henshaw*, 35 Verm., 605 ; *Butcher* v. *London & Southwestern Railway Co.*, 29 Eng. Law & Eq., 347 ; *Midland Railway Co.* v. *Bromley*, 33 id., 235 ; *Hyde* v. *Trent & Mersey Navigation Co.*, 1 Eng. Railway & Canal Cas., 571, Appendix.

BUTLER, J. The evidence in this case is very clear, and free from contradiction. Upon a careful and deliberate consideration of it, we are satisfied that it did not justify the jury in finding a contract to carry the wool to Stafford, alone, or in company with the northern road ; and that it does show an actual delivery to that road, as an independent and next carrier in a line, and a performance of all that the defendants impliedly undertook to do; and therefore that the verdict can not be sustained.

1. In the first place there is no such evidence of a contract to carry the wool to Stafford as will support the first count of the declaration.

The defendants were a corporation organized under the joint stock law of this state. Their articles of association are in evidence. The object of their association is therein declared to be " the transportation of mails, freight and passengers between New York and New London and Norwich, or other places, &c." The transportation contemplated from New York was intended to be and was in fact by water. By the articles the terminus where it was to end, and whether on the coast or inland, is not fixed definitely. But that is unimportant in this connection. Their business as then actually and permanently established was conducted by steamers from New York to New London only, and a delivery *there* to citizens of the place or the railroads which had their termini at that point. That was the *fixed* course and usage of their business as carriers. In the absence of any express contract the law implies, from the delivery and acceptance of goods for carriage, a contract to carry according to the course and

usage of the carrier's business; and if marked for a point beyond his terminus, to deliver there to the next carrier on the route. Here there was no express contract. No verbal agreement was made. The wool was received, and a written receipt given in these words:—" Received from John M. Pendleton & Co. in good order, on board the Norwich and Worcester boat, bound for Stafford, Ct., the following packages &c." That does not import a promise to carry to Stafford. Read in the light of surrounding circumstances, it is a mere acknowledgment of the receipt of the wool, and that it and not the steamer was " bound for," that is, *directed to— marked for—*Stafford, and the plaintiffs' case would have been *just as strong if the simple fact of the receipt of the wool and the marks had been proved by* other and verbal evidence. The receipt given in *Elmore* v. *The Naugatuck Railroad Company* was much stronger and yet holden a mere acknowledgment.

Nor is there any unexplained evidence that the defendants held themselves out in any manner as carriers to Stafford, and that the plaintiffs were thereby misled. There was no advertising or other representation to that effect nor was pay taken in advance for the whole distance. There was evidence of the carriage at prior times of other goods for the plaintiffs upon the boat of the defendants and over the northern road, and that the defendants made out and collected the bills for their carriage the whole distance. Unexplained that would tend strongly to show that such was their established course of business. But that is explained, and it is shown that in so collecting the freights on the railroad, they were in fact but the agents of that road, and collecting as a matter of convenience to both. There is nothing else to show a contract to carry to Stafford, and it is a case of mere reception to carry according to the fixed course of the business as conducted by the carrier.

The question whether the mere receipt of goods marked for and destined to a place beyond the terminus of a carrier's route, is *prima facie* evidence of a contract to carry to the place of destination, is not now an open one in this state. It

has been settled by the three cases of *Hood* v. *The N. York &*
*N. Haven R. R. Co.*, 22 Conn., 1; *Elmore* v. *The Naugatuck*
*R. R. Co.*, 23 id., 457; and *Naugatuck R. R. Co.* v. *The*
*Waterbury Button Co.*, 24 id., 468. Not indeed in accord-
ance with the law as recognized in England, but adversely, and
in accordance with what is deemed sound policy for this ex-
tended country, and the current of decision here, especially
in the large commercial states, where the most lines and the
greatest amount of carriage exist.

But it is claimed that if there was no express contract there
was an implied one; because, by reason of their connection
with the northern road, the defendants were carriers in fact
to Stafford. If the fact was so the defendants would be lia-
ble. But the fact was not so, and the evidence did not justify the
jury in finding it. There was a contract between the corpora-
tions which was in evidence. It did not establish and was not
intended to establish between them any community of profit
and loss, or of management or expense, and did not consti-
tute them partners. Each was entitled under it to continue
to transport independently, both in relation to the manage-
ment of and the expense upon their own routes, and between
their respective termini. It was an agreement relative to the
amount of their respective charges, or rather respecting a
proportionate division of the charges, on *through freight* and
on that only, and for certain conveniences for the mutual
delivery of such freight. It did not and could not make the
defendants so carriers in fact to Stafford, that the law will
imply a contract by the defendants to carry there from the
mere receipt by them of the goods marked for that place.

2. The defendants insist in the second place, that if a con-
tract could be found or implied from the facts as in evidence,
they could not be holden liable, because their directors had
no legal power to make such a contract which would bind the
company, and they rely on the case of *Hood* v. *The N. York &*
*N. Haven R. R. Co.*, 22 Conn., 502. The plaintiffs insist
that the case is in conflict with the whole current of authority
both in England and in this country and is not law.

That case can not be overruled or shaken on the ground

that the principles there applied are technically wrong. The principle is fundamental and elementary, that the power of a corporation is limited to the powers conferred by the charter, and such as are *necessarily* incidental thereto. The courts of other states in the cases cited have not questioned or disregarded that principle. But corporations have within a few years under general laws become so numerous, and are so connected with and so control the business of the country, and even its religious and benevolent agencies, that the courts have gradually come to think it necessary to relax the technical and theoretical strictness of the legal principles applicable to them, and subject them to the same liabilities for the acts of their agents as natural persons, so far as it can be done practically and consistently with their charters. The very rapid increase of these corporations, which now monopolize the business of land carriage and a large share of that which is done by water, and the equally rapid increase in the quantity of freight which they carry destined to points beyond their chartered termini, render it desirable for them and the business community that they should have power to make business connections and contracts with each other, and assume a joint responsibility for carriage beyond the termination of their routes, and the tendency of the courts is almost universal to recognize their power to do so, where the purpose is auxiliary, beneficial, and within a reasonable limit, as an intended or *necessary* and *incidental* power, by a liberal construction of the legislative grants. Whether we ought so to regard these changes and follow this prevailing tendency and relax the strictness of the rule by such a liberal construction in respect to the intention of the legislature or the necessity for such an incidental power, either because it is wise to do so or for the sake of uniformity, or whether we should hold to the maxim of *stare decisis,* and adhere to the old and strict construction adopted in the case relied upon, it is not necessary now to determine. There is no contract to carry beyond the terminus of the defendants' route proved by the evidence, and the question is not a material one in the case.

3. The remaining question, namely, whether there was or

not a performance of the contract set up in the second count, and an actual delivery to and acceptance by the northern road, so that the responsibility was shifted on to that corporation, is one we have deliberately considered, and feel constrained to decide in the affirmative.

It must be conceded that the defendants had transported the wool to their terminus, and carried and placed it in the common depot by the side of the railroad track, at a spot where they by usage were expected by the northern road to place it, and that no other or further act of carriage or actual manual possession was or could be expected of them. And so it must be conceded that actual manual possession had not been taken by the northern road, nor is there any direct evidence of an express agreement that the carriage to, and placing at the side of the track, in the depot, should be deemed a delivery to the road. And, at first sight, it would seem just and equitable to hold that the carriage in fact was finished by the transportation company, and that the goods were in deposit by mutual arrangement in a joint depot, to await an actual manual reception by the northern road at a future convenient hour; and so, looking to the equities of the case and the large amount involved in the other cases dependent upon the decision of this, we should be very willing to hold, if we could do so consistently with principle. But there are insuperable difficulties in such a view of the case.

We have no difficulty in determining, indeed we must hold, that there was a mutual agreement, or tacit understanding equivalent to such an agreement, that the transportation company should place the through freight at that precise spot, and that the northern road should take it from thence at a time convenient to them. The construction of the depot and the uniform usage are conclusive of it. The depot was constructed with a platform by the side of the track for the reception of goods to be taken from or put into the cars; and on that platform the railroad company, in the first and every instance of delivery by them, placed their freight, and the

transportation company at their convenience took it away and
carried it on board their boat. And so the transportation
company in like manner, in the first and every instance, placed
there the freight for the northern road ; and they at their
convenience put it in their cars and took it away. And the
usage was precisely the same with the Worcester road. It
would be a forced construction' of this usage, or rather the
agreement inferable from it, to say that an intermediate joint
deposit was contemplated. Moreover the depot was not the
joint depot of the two parties only, or erected for that purpose
only, but the joint depot of three, including the Worcester
road, and erected for and used by each, not only for the mu-
tual delivery and reception of through freight, but indepen-
dently in transacting their independent local business. Again
the defendants were carriers by water, and their place for
landing and delivery must necessarily or would naturally be
a wharf. This depot was a wharf, covered and enclosed
indeed, but still a wharf and the only one occupied by them.
Upon this wharf and into the enclosure the northern road
laid their track for the delivery and reception of freight to
and from the transportation company. Both parties then
contemplated a delivery and reception on this wharf and in
this enclosure, and obviously in the precise manner actually
pursued. If a carrier by water notifies the consignee of his
arrival and readiness to deliver the goods, and the consignee
says to him " land them in a particular place, on a particular
wharf, and I will take them away at my convenience," and
he so lands them, it is a delivery. And what he says in a
particular case expressly he may say for all cases and by his
conduct or by usage. And so these connecting carriers prac-
tically if not expressly said to each other. It is clear then
that both the transportation company and the northern road
contemplated that a placing of freight by either intended for
the other upon that platform was all that either was to do by
way of delivery of their freight to each other ; that they did
not contemplate such placing as an intermediate deposit, to
be watched by the party depositing, or as a joint deposit, at
the joint risk and in the joint possession of both ; but that

Converse *v.* Norwich & N. York Transportation Co.

they relied on the enclosure as a protection, and considered the placing of the freight in the usual spot upon the platform as a delivery.

The minor facts respecting the time and manner of delivering the way-bills—the examination of the freight and checking of the way-bills to be sure that all had been delivered—the proportionate extent and the manner of their joint use and possession of the depot—the looking up or paying for missing goods—and the practice of letting the Saturday freight remain on the platform until Monday morning—are only material as they bear upon the great question, namely, what was it agreed or understood between the defendants and the northern road should constitute a delivery from one to the other. It is sufficient to say that they all tend to confirm rather than to rebut the inference drawn from the original construction of the depot and platform, and the uniform practice and usage respecting their use.

A new trial must be advised.

In this opinion the other judges concurred.