TEXAS & P. RY. CO. v. CLAYTON et al.

(Circuit Court of Appeals, Second Circuit.   December 8, 1897.)

1. CARRIER OF FREIGHT—LOSS OF GOODS—DELIVERY TO CONNECTING CARRIER.
  A railroad company received certain cotton for shipment over its road and
  a connecting steamship line.  It owned a wharf at the point of connection,
  on which it deposited the cotton, and from which, according to usage between
  the two carriers, the steamship company loaded freight into its vessels,
  being notified when goods were received for transfer to its line, and such
  goods being checked out by a clerk of the railroad company, after which a
  receipt was taken for the same.  The steamship company was notified of
  the arrival of the cotton, and requested to remove it as soon as practicable;
  but, before it had done so, the cotton was burned, without fault or negli-
  gence on the part of the railroad company.  *Held*, that there had been no
  delivery from the railroad to the steamship company, which had acquired
  no right of control over the cotton.

2. SAME—LIABILITY AS WAREHOUSEMAN.
  Under such circumstances, the railroad company cannot be considered as
  having ceased to hold the cotton as a carrier, and to have become a ware-
  houseman, it having done nothing evidencing such an intention.

In Error to Circuit Court of the United States for the Southern
District of New York.

Action by Clayton and another against the Texas & Pacific Rail-
way Company to recover the value of cotton destroyed after its deliv-
ery to the defendant as a carrier.   There was a judgment for plain-
tiffs on a verdict directed by the court, and defendant brings error.

Rush Taggart and Arthur H. Masten, for plaintiff in error.

Evarts, Choate & Beaman and Treadwell Cleveland, for defendants
in error.

Before WALLACE and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge.   This is a writ of error by the de-
fendant in the court below to review a judgment which was entered
upon a verdict directed in favor of the plaintiffs upon the trial.   The
action was brought to recover damages alleged to have been sustained
by the plaintiffs by the burning of 467 bales of cotton on the 12th
of November, 1894, at Westwego, in the state of Louisiana.

The facts established upon the trial were that the plaintiffs, co-
partners, at Liverpool, England, by the style of Newall & Clayton,
through their agents, Castner & Co., at Bonham, Tex., delivered in Oc-
tober, 1894, to the defendant, four lots of cotton for transportation;
the contract being evidenced by four bills of lading, identical in form
except as to the number of bales, the marks on the cotton, and the
numbers of the bills of lading.   The material parts of the bills of lad-
ing were as follows:

"Received by the Texas & Pacific Railway Co., * * * of Castner & Co.,
for delivery to shippers' orders, or their assigns, at Liverpool, England, he or
they paying freight and charges as per margin, bales of cotton [here follow the
number of bales and the marks].  From Bonham, Texas, to Liverpool, England.
Route via New Orleans and the Elder &. Demster & Co. Steamship Line [here
follow the amount of freight and advance charges], upon the following terms
and conditions, which are fully assented to and accepted by the owner, viz.:  (1)
That the liability of the Texas & Pacific Railway Company in respect to said

cotton, and under this contract, is limited to its own line of railway, and will cease and its part of this contract be fully performed upon delivery of said cotton to its next connecting carrier; and in case of any loss, detriment, or damage done to or sustained by said cotton before its arrival or delivery at its final destination, whereby any legal liability is incurred by any carrier, that carrier alone shall be held liable therefor in whose actual custody the cotton shall be at the time of such damage, detriment, or loss. * * * (6) That the said cotton shall be transported from the port of New Orleans to the port of Liverpool, England, by the Elder, Demster & Co. Steamship Line, and with liberty to ship by any other steamship or steamship line; and that, upon delivery of said cotton to said ocean carrier at the aforesaid port, this contract is accomplished; and thereupon and thereafter the said cotton shall be subject to all the terms and conditions expressed in the bills of lading and master's receipt in use by the steamship or steamship company or connecting lines by which said cotton may be transported; and, upon delivery of said cotton at usual place of delivery of the steamship or steamship line carrying the same at the port of destination, the responsibility of the carriers shall cease."

Two of the bills of lading were dated October 10th; one was dated October 15th; and one was dated October 23d. There was an existing arrangement at the time between the defendant and the Elder, Demster & Co. Steamship Line, by which the former was to forward the latter, during the months of October, November, and December, 1894, 20,000 bales of cotton for transportation by the steamship line to Liverpool; and it was understood between them that the cotton was to be received by the steamship line at the defendant's wharf at Westwego. This wharf was at the terminus of a branch of the defendant's line of railway, on the bank of the Mississippi river, and was built out over the river far enough so that cars could be run upon the tracks in the rear of the wharf and unloaded, and vessels come to the front of the wharf and receive the freight thus unloaded. It was controlled exclusively by the defendant, and used by it for the temporary storage of freight of all kinds brought over its railway, and awaiting delivery to the consignees or for transportation by vessels. The course of business between the defendant and the steamship line was as follows: Upon the shipment of the cotton in Texas, bills of lading would be issued to the shipper. Thereupon the cotton would be loaded in cars of the defendant, and a waybill giving the number and initial of the car, the number and date of the bill of lading, the date of the shipment, the names of consignor and consignee, the number of bales forwarded on that particular waybill, the marks on the cotton, the weight, etc., would be given to the conductor of the train bringing the car to Westwego. Upon the receipt of the waybill and car at Westwego, a skeleton would be made out by the defendant's clerks at Westwego, for the purpose of unloading the car property, containing the essential items of information covered by the waybill and the date of the making of the skeleton. When this skeleton had been made out and the car had been side tracked at the rear of the wharf, the skeleton would be taken by the defendant's check clerk, and he would proceed with a gang of laborers to open the car. The cotton would then be taken from the car, examined to see that the marks corresponded with the items upon the skeleton, and deposited in one of the sheds upon the wharf designated by the check clerk, and the check clerk would mark upon the skeleton the location of the cotton. The sheds were subdivided into 15 sections, and the location of the

cotton was left to the check clerk.   The skeleton would then be transmitted to the general office of the defendant, and the defendant would make out a "transfer sheet," containing substantially the information contained in the waybill, and transmit the transfer sheet to the steamship line.   The steamship line, upon receiving the transfer sheet understood that cotton for their vessels was on the wharf at Westwego, and would collate the transfers relating to such cotton as was destined by them for a particular vessel, return the transfer sheet to the defendant, and advise defendant what vessel would take the cotton.   Thereafter the steamship company, when it was ready to take the cotton, would send the vessel with their stevedores to the wharf.   The defendant's clerk would go with the master of the vessel, and identify and count out the particular lots of cotton designated for his vessel.   The master would "O. K." them, and the stevedores would thereupon take the cotton, and put it on board the ship.   Before the cotton left the wharf, the defendant would obtain a receipt for it from the master of the ship.

The particular cotton involved in this suit had arrived and been unloaded upon the wharf at Westwego prior to November 5th.   The transfer sheets had been transmitted by the defendant to the steamship line prior to November 10th; and prior to November 12th the steamship line had returned the transfer sheets to the defendant. The fire occurred upon the evening of November 12th.   In the forenoon of that day the defendant gave notice to the steamship line that the cotton was upon the wharf, and requested the latter to come and remove it as soon as practicable.   The fire took place without any fault or negligence on the part of the defendant.

Upon the facts thus established, the defendant requested the trial judge to instruct the jury to find a verdict in its favor, upon two grounds:   First, that the evidence showed a delivery to the steamship line, the connecting carrier; and, second, that, if there had not been a delivery to the steamship line, there had been a tender of the cotton to the connecting carrier, and therefore the defendant held the cotton simply as a warehouseman, and, there being no proof of negligence, was not responsible for the loss.   The plaintiffs also requested the trial judge to instruct the jury to find a verdict in their favor. The trial judge refused the instructions asked for by the defendant, and directed the jury to find a verdict for the plaintiffs in a sum which had been stipulated as the amount of the loss.   In directing a verdict, the trial judge made the following observations:

"As I understand the testimony, the steamship company had no business to come there to move the goods from one part of the dock to another, nor to change the way in which they were placed upon the dock.   They could come there during business hours, and ask to have their goods pointed out to them; and could then, by their employés, during business hours, at a time when the railroad company was willing that they should come, move the goods from a particular location to the steamer, giving a receipt for them.   But, aside from that, I do not understand that they had any control over the goods.   They certainly had no control over the dock as a dock.   They had nothing to do as to determining whereabouts on the dock their goods were to be placed.   If they were placed by post 29 when they arrived on Monday, they might be moved by the railroad company to post 43 on Tuesday, without the permission of the steamship company, and without consulting the steamship company.   On the

other hand, the steamship company could not move one bale on the dock from where it had been put to another place on the dock. It could only move the goods from the dock to its ship, and then with the permission of the railroad company."

The only question presented by the assignments of error is whether the trial judge correctly ruled that, upon the whole case, plaintiffs were entitled to recover. It was assumed by both parties, each having moved that a verdict be directed, that there was no disputed question of fact for the jury.

In the absence of a special contract qualifying the ordinary obligations of a common carrier, when goods are delivered to a railway company for transportation to a destination beyond its own line through the intervention of a connecting carrier, it is liable as an insurer of the goods until it has delivered them to the connecting carrier, or unless, by the refusal or inability of the connecting carrier to receive them, it is justified in storing them, and has taken the necessary steps to occupy the relation of a warehouseman. Although the second carrier, after notice and a request to do so, has neglected for an unreasonable time to receive the goods, the first carrier must, to exonerate himself as an insurer, in some way clearly indicate his renunciation of the relation of carrier. Goold v. Chapin, 20 N. Y. 259. It was said by the court in Railroad Co. v. Manufacturing Co., 16 Wall. 318, that:

"The rule that holds the carrier only liable to the extent of his own route, and for the safe storage and delivery to the next carrier, is in itself so just and reasonable that we do not hesitate to give it our sanction. Public policy, however, requires that the rule should be enforced, and will not allow the carrier to escape responsibility on storing the goods at the end of his route, without delivering or attempting to deliver to the connecting carrier. If there be a necessity for storage, it will be considered a mere accessory to the transportation, and not as changing the end of the bailment. It is very clear that the simple depositing of the goods by the carrier in his depot, unaccompanied by any act indicating an intention to renounce the obligation of a carrier, will not change or modify even his liability. It may be that circumstances may arise after the goods have reached the depot which would justify the carrier in warehousing them; but, if he had reasonable grounds to anticipate the occurrence of these adverse circumstances when he received the goods, he cannot, by storing them, change his relation towards them."

What constitutes a sufficient delivery to the connecting carrier is sometimes a doubtful question. A manual transfer of possession is not essential. A constructive change of possession from the first to the second carrier may amount to a delivery. It may be safely affirmed, as a proposition applicable to all cases, that a deposit of the goods with notice, express or implied, at any place where the second carrier has control of them, conformably with usage created by the course of the business between the two carriers, is a sufficient delivery, and discharges the first carrier. The liability of the second carrier begins when that of the first ends. Van Santvoord v. St. John, 6 Hill, 157; Mills v. Railroad Co., 45 N. Y. 622. In Insurance Co. v. Wheeler, 49 N. Y. 616, where connecting carriers had, at the point of connection, a warehouse used in common for the transfer of goods from one line to the other, the expenses of handling being paid in common, it was held that the delivery of goods there by one carrier, with notice

to the other of their arrival and ultimate destination, placed them in the possession of the latter, and subjected him to responsibility as a carrier. In Converse v. Transportation Co., 33 Conn. 166, a railroad company and a steamboat company had a covered wharf in common, at their common terminus; and it was the established usage for the steamboat company to land goods for the railroad on the arrival of its boats at night upon a particular place on the wharf, whence they were taken by the railroad company at its convenience, for further transportation. There was no evidence of an actual agreement that the goods thus deposited were in the possession of the railroad company, but the court was of opinion that there was a tacit understanding that the steamboat company should deposit its freight at that particular place, and that the railroad should take it thence at their convenience. It was held that a deposit of goods accordingly by the steamboat company was a sufficient delivery to the railroad company, and a recovery against the former for the loss of the goods was reversed. In Pratt v. Railway Co., 95 U. S. 43, the Michigan Central Railroad Company and the Grand Trunk Railroad Company used a freight depot of the former, and when goods were deposited by the latter in a certain part of the depot, destined over the road of the former, they were set apart by the employés of the latter; and, after they were so placed, the employés of the Grand Trunk Railway did not further handle them. After being so set apart, the Michigan Central Railroad Company would obtain from the Grand Trunk Railway Company a list describing the goods and their ultimate destination, and make out a waybill for their transportation over its own road. Certain goods which had been thus set apart for transportation over the line of the Michigan Central Railroad Company were burned before they were loaded into its cars, but after it had obtained the descriptive list. It was held that there had been a delivery by the Grand Trunk Railway Company to the Michigan Central Railroad Company. The court said:

"No further orders or directions from the Grand Trunk Company were expected by the receiving party. Except for the occurrence of the fire, the goods would have been loaded into the cars of the Michigan Central Company, and forwarded without further action of the Grand Trunk Company."

In the present case the cotton had never been placed within the control of the steamship line by the defendant. It was not set apart from the other cotton on the wharf, awaiting transportation by other steamship lines or vessels, further than by placing it, when unloaded from the cars, near certain numbered posts in the shed, where it might remain until called for, or might be removed by the defendant to some other location, to suit its own convenience. Before the steamship line could have identified it for the purpose of removal, and after that, before they could have exercised any control over it, the co-operation and assistance of the defendant were necessary.

There is no room for the contention that the defendant had ceased to be a carrier and become a warehouseman. It had done no act evidencing its intention to renounce the one capacity, and assume the other. Although it had requested the steamship line to remove the cotton, it had not specified any particular time within which compli-

ance was insisted on, and had not given notice that the cotton would be kept or stored at the risk of the steamship line upon failure to comply with the request. The request to come and remove it "as soon as practicable" was, in effect, one to remove it at the earliest convenience of the steamship line. There is nothing in the case to indicate that the defendant had not acquiesced in the delay which intervened between the request and the fire.

The bills of lading did not restrict the ordinary liability of a carrier who receives goods for a destination beyond its own line, for transportation by a connecting carrier. On the contrary, the contract between the parties was carefully framed to adjust the liability of the carriers as between themselves, and to protect the shipper, in the event of a disputable custody of the goods. By its terms, the carrier, and that carrier only, "in whose actual custody" the cotton should be, was to be liable for any loss or damage to it whereby any legal liability might be incurred. It was the manifest purpose of this provision to define the rights of the parties to the contract in the event of doubt or dispute, and to make that carrier liable only who was in actual custody of the goods at the time of the loss, irrespective of the question whether there had been any constructive change of possession between the two carriers previously.

A verdict for the plaintiffs was properly directed. The judgment is therefore affirmed.