REISS et al. v. TEXAS & P. RY. CO.

(Circuit Court of Appeals, Second Circuit. December 7, 1899.)

No. 77.

1. CARRIERS—CONSTRUCTION OF BILL OF LADING—PROVISIONS CHANGING COMMON-LAW LIABILITY.

Plaintiffs delivered cotton to defendant railroad company at a point in Texas for carriage over its line to New Orleans, and from there over a connecting steamship line to a foreign port. Defendant maintained a wharf at New Orleans, upon which it unloaded from its cars and piled cotton for export, and from which such cotton was taken by the steamship companies, being checked out from the piles, and receipted for at the

time it was loaded on the vessel. It was defendant's custom to notify the several steamship companies of the arrival at its wharf of cotton billed for shipment over their lines. After plaintiff's cotton had arrived and had been piled on the wharf, but before the steamship company had been notified of its arrival, it was destroyed by fire. The conditions of the bill of lading for such cotton were divided into two classes, one relating to the service until, the other to the service after, delivery at the port of New Orleans. Among the former was a clause providing that "no carrier shall be liable for delay, nor in any other respect than as warehouseman, while the said property awaits further conveyance." *Held*, that under such provision defendant's liability as carrier was not changed to that of warehouseman prior to notification of the steamship company that the cotton was ready for delivery; that both the exemption from liability for delay and the substitution of liability as warehouseman must be construed as taking effect only after the service of defendant had been completed, and the property awaited the action of the connecting carrier.

**2. SAME—PLACE OF DELIVERY—PORT OF NEW ORLEANS.**

The delivery of the cotton by defendant at its wharf at West Wego, which is on the opposite side of the river from New Orleans, was a compliance with the bill of lading requiring its delivery at the port of New Orleans, although West Wego was not at that time within the boundaries of the port of New Orleans, as defined in the statute, it being, in a well-understood commercial and business sense, the part of that port where steamship companies rightfully expected to receive cotton from Texas for transportation to European ports.

In Error to the Circuit Court of the United States for the Southern District of New York.

Treadwell Cleveland, for plaintiffs in error.
Rush Taggart, for defendant in error.

Before WALLACE and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. The plaintiffs, who are cotton merchants in the city of Liverpool, and aliens, delivered on October 30, 1894, at Temple, in the state of Texas, to the defendant, a railroad corporation created by virtue of an act of congress, and a common carrier from places in Texas to New Orleans, 200 bales of cotton, to be carried by the defendant from Temple to the port of New Orleans, and thence by Elder, Dempster & Co.'s line of steamships to Bremen, Germany. The conditions of the bill of lading which was issued for this cotton were divided into two classes, one relating to the service until, and the other relating to the service after, delivery at the port of New Orleans. All the bales arrived at West Wego on November 6, 1894, and 160 bales were unloaded on the next day, and the remaining 40 were also unloaded, but the day of unloading does not appear. All the bales were placed on the defendant's wharf, 120 bales at one point, and each lot of 40 bales at separate and different points. All the cotton was destroyed by fire on the evening of November 12th. At this time the wharf was loaded to its full extent with cotton, there being on the wharf over 20,000 bales, and 206 cars containing 8,000 bales. West Wego is in the parish of Jefferson, on the west bank of the Mississippi, opposite the upper end of the city of New Orleans. Before the construction by the defendant of a wharf and terminals at this point, it delivered all export cotton at its freight depot and warehouse on the east side of the river, in New

Orleans proper. The West Wego structure was completed in the early spring of 1893, and thereafter all export cotton coming from Texas was delivered to the steamship companies at West Wego, which was the port of New Orleans for export cotton in the popular business and commercial sense, though it was not included by statute of the United States in the customs district or port of entry of New Orleans until March 30, 1896. The conditions of the bill of lading which are important in this case "with respect to the service until delivery at the port of New Orleans" are as follows:

"(1) No carrier or party in possession of all or any of the property herein described shall be liable for any loss thereof or damages thereto by causes beyond its control, or by floods, or by riots, quarantine, strikes, or stoppage of labor, or by leakage, breakage, chafing, loss in weight, changes in weather, heat, frost, wet, or decay, or from any cause if it be necessary or is usual to carry said property upon open cars."

"(3) No carrier shall be liable for loss or damage not occurring on its own road, or its portion of the through route, nor after said property is ready for delivery to the next carrier or to consignee."

"(11) No carrier shall be liable for delay, nor in any other respect than as warehouseman, while the said property awaits further conveyance; and, in case the whole or any part of the property specified herein be prevented by any cause from going from said port in the first steamer of the ocean line above stated leaving after the arrival of said property at said port, the carrier hereunder then in possession is at liberty to forward said property by succeeding steamer of said line, or, if deemed necessary, by any other steamer."

"(12) This contract is executed and accomplished, and all liability hereunder terminates, on the delivery of the said property to the steamship, her master, agent, or servants, or to the steamship company, or on the steamship pier at the said port; and the inland freight charges shall be a first lien, due and payable by the steamship company."

The defendant was in the habit, in 1894, of making contracts with divers steamship companies, including Elder, Dempster & Co.'s line, in New Orleans, by which they were to transport to European ports cotton received by them at the defendant's wharf at West Wego. The particular contract under which Elder, Dempster & Co. were to transport the plaintiffs' bales was dated October 19, 1894, and was in the form of a letter to the agents of the steamship company from the agent of the defendant, saying that he had engaged 1,000 bales of cotton for shipment by their line to Bremen at a specified rate. The course of business between the steamship lines and the defendant was stated in Texas & P. Ry. Co. v. Clayton, 28 C. C. A. 142, 84 Fed. 305, and was as follows:

"This wharf was at the terminus of a branch of the defendant's line of railway on the bank of the Mississippi river, and was built out over the river far enough so that cars could be run upon the tracks in the rear of the wharf and unloaded, and vessels come to the front of the wharf and receive the freight thus unloaded. It was controlled exclusively by the defendant, and used by it for the temporary storage of freight of all kinds brought over its railway and awaiting delivery to the consignees or for transportation by vessels. * * * Upon the shipment of the cotton in Texas, bills of lading would be issued to the shipper. Thereupon the cotton would be loaded in cars of the defendant, and a waybill giving the number and initial of the car, the number and date of the bill of lading, the date of the shipment, the names of consignor and consignee, the number of bales forwarded on that particular waybill, the marks on the cotton, the weight, etc., would be given to the conductor of the train bringing the car to West Wego. Upon the receipt of the waybill and car at West Wego, a skeleton would be made out by the defend-

ant's clerks at West Wego, for the purpose of unloading the car properly, containing the essential items of information covered by the waybill, and the date of the making of the skeleton. When this skeleton had been made out, and the car had been side-tracked at the rear of the wharf, the skeleton would be taken by the defendant's check clerk, and he would proceed with a gang of laborers to open the car. The cotton would then be taken from the car, examined to see that the marks corresponded with the items upon the skeleton, and deposited in one of the sheds upon the wharf designated by the check clerk, and the check clerk would mark upon the skeleton the location of the cotton. The sheds were subdivided into fifteen sections, and the location of the cotton was left to the check clerk. The skeleton would then be transmitted to the general office of the defendant, and the defendant would make out a 'transfer sheet,' containing substantially the information contained in the waybill, and transmit the transfer sheet to the steamship line. The steamship line, upon receiving the transfer sheet, understood that cotton for their vessels was on the wharf at West Wego, and would collate the transfers relating to such cotton as was destined by them for a particular vessel, return the transfer sheet to the defendant, and advise defendant what vessel would take the cotton. Thereafter the steamship company, when it was ready to take the cotton, would send the vessel, with their stevedores, to the wharf, the defendant's clerk would go with the master of the vessel, and identify and count out the particular lots of cotton designated for his vessel, the master would O. K. them, and the stevedores would thereupon take the cotton and put it on board the ship. Before the cotton left the wharf, the defendant would obtain a receipt for it from the master of the ship."

No transfer sheets respecting the cotton in suit, and no notice of its arrival at West Wego, were ever sent to the steamship company. A practice has grown up since the fire for a vessel to receive cotton which had arrived in accordance with the bill of lading for which the ship had room, although the steamship company had not received transfer sheets; that is, to receive any cotton which entirely corresponded with the bills of lading for which it had room, and receipt for it. This cannot be stated as at any time a general usage. The case turned in the circuit court upon the construction of clause 11 of the bill of lading, and the circuit judge was of opinion that the term "awaiting further conveyance" meant not only when the next carrier was about to take possession, but when the property had been unloaded from the cars, and placed in proper position for future transportation, although notice of arrival or tender of delivery has not been made. He therefore directed a verdict for the defendant, and to review the judgment which was entered upon the verdict this writ of error was taken.

The subject of the obligation of a carrier, at common law, towards property while it is in transportation to its ultimate destination, and is to be taken by a connecting carrier, was considered in Michigan Cent. R. Co. v. Mineral Springs Mfg. Co., 16 Wall. 318, 21 L. Ed. 297; Texas & P. Ry. Co. v. Clayton, 173 U. S. 348, 19 Sup. Ct. 421, 43 L. Ed. 725; Id., 28 C. C. A. 142, 84 Fed. 305; and Goold v. Chapin, 20 N. Y. 259. In the first-named case it is said:

"In such cases it is the duty of the carrier, in the absence of any special contract, to carry safely to the end of his line, and to deliver to the next carrier beyond; and that public policy requires that the rule should be enforced, and will not allow the carrier to escape responsibility at the end of his route without delivery or an attempt to deliver to the connecting carrier."

Furthermore, in the like absence of a special contract, it was said in the Clayton Case, in this court:

"Although the second carrier, after notice and a request to do so, has neglected for an unreasonable time to receive the goods, the first carrier must, to exonerate himself as an insurer, in some way clearly indicate his renunciation of the relation of carrier."

The mere unreasonable delay of the connecting carrier is not sufficient to convert the first carrier into a warehouseman. This renunciation is ordinarily shown by notice to the connecting carrier that the property will be kept or stored at its risk until compliance with the request to remove. Texas & P. Ry. Co. Cases, supra. This rule of law being admitted, it is said by the defendant that a special contract was clearly stated in its bill of lading, by which it became a warehouseman from the time that the cotton was unladen and piled upon the wharf to await cartage to the steamship. It is not claimed that the facts bring the carrier's liability within clause 3 of the bill of lading, which says that the liability shall end after the property "is ready for delivery" to the next carrier, for it is conceded that the goods are not awaiting delivery before any notification of their arrival to the connecting carrier. McKinney v. Jewett, 90 N. Y. 267. It is, however, insisted that the fair construction of clause 11 is that, when the act of transportation of the cotton to the wharf at West Wego has been accomplished, and it has been stacked on the wharf, and "is awaiting further action in the way of notification and advice to the succeeding carrier," it awaits further conveyance. By this construction the parties substituted an immediate cessation of the liability of a carrier, and the assumption of the liability of a warehouseman for the liability imposed by the common law, and doubtless they were at liberty to make a contract of limitation which will be enforced if the language of the bill of lading clearly indicates that such was their intention. In order to justify the defendant's construction, the claimed extent of the departure from the implied contract of the common law must clearly appear in the language which is used in the special contract. The clause, "no carrier shall be liable for delay," when applied to the facts in this case, meant that the defendant should not be liable for the delay of the steamship company, but delay would not occur until it knew or had heard of the time of arrival of the cotton. The same idea of notification to the connecting line must also run through the entire paragraph, and, while the term "awaiting further conveyance" literally means "awaiting the time when the next carrier shall take the property in hand," it seems improbable that it was the intent of the language that the liability of the carrier should terminate upon the deposit of the property upon the wharf. The language is too indefinite to support the conclusion that notice to the connecting line was not a prerequisite to the change of liability to that of a warehouseman. It may well be that such change would take place when the property was awaiting conveyance by the connecting line which had been notified to receive and convey, but until then it is not awaiting conveyance; it is awaiting the action of the first carrier. The term must mean awaiting conveyance by the person upon whom the duty of conveyance devolved, and no such duty devolved until notice of the arrival of the property had been given. The pro-

visions of the bill of lading in Draper v. Canal Co., 118 N. Y. 118, 23 N. E. 131, which was construed to free the carrier from liability from the time the property reached the point of destination, were far more definite than those in this case. In the direction of a verdict for the defendant, when no notice of the arrival of the property had been given to the next carrier, or had been received by it, we think that error was committed.

The plaintiff in error also made the point that by the bill of lading the cotton was to be delivered at the port of New Orleans, and that, therefore, the defendant had no right to unload it at West Wego. It is true that West Wego was not, in 1894, within the boundaries of the port of New Orleans, as defined in the statute of the United States, but it was, so far as export cotton is concerned, that port in the well-understood commercial and business sense, and was the part of the port of New Orleans where steamship companies rightfully expected to receive cotton from Texas for transportation to Europe. A kindred subject in regard to the limits of the port of New York was carefully considered in Devato v. 823 Barrels of Plumbago (D. C.) 20 Fed. 510; Sailing Ship Garston Co. v. Hickie, 15 Q. B. Div. 580; Price v. Livingstone, 9 Q. B. Div. 679. If the circuit judge should be of opinion that the liability of the defendant was that of a warehouseman, the plaintiff asked to go to the jury upon the question of negligence of the defendant as a warehouseman in not taking larger precautions against fire when an accidental fire might reasonably have been expected. Inasmuch as we are of opinion that the defendant was not a warehouseman, any expressions upon the subject of negligence would be obiter. The judgment of the circuit court is reversed, with the costs of this court, and the case is remanded to that court for a new trial.