JAMES L. LAMB *v.* THE CAMDEN AND AMBOY RAILROAD AND TRANSPORTATION COMPANY.

THE defendants' steamboat was moored to a pier upon which was their railroad depot, containing a large quantity of combustible materials, and the roof of which was coated with tar. The plaintiff's goods, which had been unshipped from the boat, were deposited on the defendant's pier, and during the night, a fire, the immediate cause of which was not proved, broke out upon the steamboat, and in a very short time the boat and depot were in flames, and the plaintiff's goods, with the other contents of the depot, were burned up. Four watchmen were on duty upon the pier at the time, but there was no watchman upon the steamboat. The bills of lading issued by the defendants to the plaintiff contained a stipulation exempting the defendants from liability for loss or injury to the goods by fire.

*Held,* that the stipulation in the bill of lading, exonerating the defendants from liability for the loss of the goods by fire, did not operate to divest them of their public character as common carriers, but merely to exempt them from liability in such a case, where there was no fault or negligence on their part.

Hence it was not enough for the defendants to show that the plaintiff's goods were destroyed by fire, but the burden of proof was on them to show that their destruction by that element was without any fault on their part, and that they exercised all the care and diligence for the safety of the goods which could be reasonably expected under the circumstances.

*Held,* that it was not error to charge the jury that if the defendants omitted to take that degree of care which persons of ordinary prudence usually take of such property, under such circumstances, they were liable. Nor was it error to instruct the jury that the omission of the defendants to place a watchman actually on the boat, charged with the duty of guarding her, might be considered by them, on the question of negligence, as this was no more than telling them to determine the question upon all the circumstances of the case.

As a general rule, where the liability of a bailee turns upon the point whether the loss of, or injury to, the property in his custody was owing to the want of ordinary care and diligence on his part, it should, even where there is no conflict as to the facts, be left to the jury to determine, under proper instructions; and their verdict should be regarded as decisive and final upon such a question, unless the case is one warranting the conclusion that they must have been influenced in their verdict by other motives than the consideration of the circumstances arising upon the evidence.

*Held further,* that it was not error for the court to refuse to charge the jury that the loss must have arisen *solely* from the defendants' negligence. If the neg-

Lamb v. The Camden and Amboy Railroad and Transportation Company.

ligent act or omission of the defendants contributed to the loss, it is not for the court or for the jury to measure in what proportion or degree, if the act or omission was in itself a want of ordinary care and diligence, unless the loss or injury *must* have happened, notwithstanding the act or omission complained of.

The liability of a common carrier continues for a reasonable length of time within which the plaintiff may take his goods away; and what is a reasonable length of time, under the circumstances, is a question for the jury, even where there is no conflict of testimony. This rule is not affected by the provision of the bill of lading that the goods were to be delivered at the carrier's depot.

*It seems* that where the goods were lost after their arrival at the place of destination by the carrier's want of ordinary care, it is immaterial whether a reasonable time had elapsed within which the owner might have taken them away.

A new trial will not be granted on the ground that incompetent evidence was admitted on the trial, where the evidence was as to facts wholly immaterial to the issues.

An action against a common carrier for the loss of goods undertaken to be carried by him may be founded upon the contract for carriage, or upon the breach of his duty as a carrier; and where negligence is averred and proved, if the complaint is defective in setting up also a contract, the court may, after verdict, amend the complaint so as to conform the pleading to the proof.

An intermediate carrier is entitled to the benefit of any agreement entered into by the owner of the goods carried with the first carrier, qualifying or limiting the common law responsibility, and will be regarded as taking the goods for carriage upon the same conditions and subject to the limitations or exceptions that exist in that agreement. But the mere delivery by such intermediate carrier to the carrier from whom he received the goods, of a receipt containing a condition that the value of the property at the place of shipment shall govern in the event of loss, is not a contract made with the owner, and does not change the common-law rule as to the measure of damages in an action against the intermediate carrier for loss of the goods on his route.

APPEAL by the defendant from a judgment entered on the verdict of a jury.

The action was brought to recover damages for the loss of 138 bales of cotton, part of a larger amount, which had been delivered to the defendants at Philadelphia, to be transported by them to New York. 790 bales of cotton were shipped by the plaintiffs, June 25th, 1864, at Cairo, Illinois, on the Illinois Central Railroad, to be carried by them to Chicago. The Illinois Central Railroad Co. issued its receipts or bills of lading for the cotton, and carried and delivered it to the Union Transportation and Insurance Company, to be transported to New

York.   The latter company issued its receipts or bills of lading therefor.   Of this cotton, however, one bale was not accounted for by the Illinois Central Railroad Company, and 789 bales were delivered to the Union Transportation Company, and by that company delivered to the defendants at Philadelphia.

Of the 789 bales received by the defendants, all were delivered by them except 137 bales.   These 137 bales were destroyed by fire while in defendants' custody, at their pier, in the city of New York, which fire destroyed defendants' boats, pier, and all the goods therein contained.

This fire occurred on the night of Sunday, July 10th, 1864. Of the cotton so destroyed 59 bales arrived at defendants' pier about midnight of the Saturday before the fire, July 9th, 1864. The balance of the cotton destroyed arrived at defendants' pier on the morning of Saturday before the fire.

The defendants' consignees had four carts working on Saturday up to three o'clock in removing this cotton.   They stopped work at three o'clock, because the proprietors of the warehouse refused to receive any more cotton on that day, as they closed at three o'clock on Saturdays.

The bills of lading or receipts above referred to contained exemptions, or exceptions that the carrier was not to be liable in case of loss by fire; and " when losses occur for which the carriers may be responsible, the cost or value of the property at the date of shipment shall govern the settlement of the same."

The court, on the trial, held that these bills or receipts were contracts with the plaintiffs restricting the liability of the carrier, and that the defendants were entitled to the benefit of them.   The court, however, held that to avail themselves of this exemption, the defendants must show that the loss was occasioned without negligence or want of ordinary care on their part.

Considerable evidence was taken as to this question of negligence on both sides.

The jury rendered a verdict for the plaintiffs for $81,618.07, being the value of the cotton, at New York, with interest.

The various exceptions taken on the trial are stated in the opinion of the court.

The defendants appealed.

*Lewis B. Woodruff* and *C. F. Sanford*, for the appellants, contended that the exceptions contained in the bills of lading converted the defendants' common-law liability into a qualified responsibility, and cited *Mercantile Mut. Ins. Co.* v. *Chase* (1 E. D. Smith, 115); *Parsons* v. *Monteath* (13 Barb. 353); *Moore* v. *Evans* (14 Barb. 526); *Meyer* v. *Harnden's Ex. Co.* (24 How. Pr. 290); *Dorr* v. *New Jersey Steam N. Co.* (4 Sandf. 136; 11 N. Y. 485); *Stoddard* v. *Long Island R. R. Co.* (5 Sandf. 180); *Mercantile Mut. Ins. Co.* v. *Calebs* (20 N. Y. 173); *Moriarty* v. *Harnden's Express* (1 Daly, 227); *Swindler* v. *Hilliard* (2 Rich. 286); *Camden & Amboy R. R Co.* v. *Baldauf* (16 Penn. St. 67); *Bingham* v. *Rogers* (6 Watts & S. 495); *Beekman* v. *Shouse* (5 Rawle, 179); *Farmers & Mechanics' Bank* v. *Champlain Trans. Co.* (23 Verm. 186).

Accordingly, the appellants, under the special contracts as to the transportation of the cotton, were, as to risk of loss by fire, simply ordinary bailees of the cotton for hire; and, having explained the cause of the loss, the proof of negligence or want of due care was upon the owner of the goods, and the owner is not bound to prove affirmatively that the loss was not caused by negligence. (*Harris* v. *Packwood*, 3 Taunt. 264; *Marsh* v. *Horne*, 5 Barn. & Cress. 322; *Beekman* v. *Shouse*, 5 Rawle, 179; *Clark* v. *Spence*, 10 Watts, 335; *Runyon* v. *Caldwell*, 7 Humph. 134; *Newton* v. *Pope*, 1 Cowen, 109; *Schmidt* v. *Blood*, 9 Wend. 268; *Foote* v. *Storrs*, 2 Barb. 326; *Harrington* v. *Snyder*, 3 Barb. 380; *Bush* v. *Miller*, 13 Barb. 489.)

In the following cases the same rule was noticed and approved of: *Clay* v. *Willan* (1 H. Bl. R. 298); *Levie* v. *Waterhouse* (1 Price, 280); *Gilbart* v. *Dale* (5 Ad. & Ellis, 543); *Newstadt* v. *Adams* (5 Duer, 43); *Logan* v. *Matthew* (6 Barr, 417); *Moore* v. *Evans* (14 Barb. 524.) The only cases in which an ordinary bailee for hire has been held bound to prove that the goods intrusted to him were not lost or injured through his

negligence or default, were where the bailee had refused or failed to account for the loss, or to show that the same was occasioned by one or other of the causes provided for by the contract. This was the distinctive feature, or governing principle, of the decision in each of the following cases: *Logan* v. *Matthews* (6 Barr, 417); *Skinner* v. *London, Brighton & South Coast Railway Co.* (2 Eng. L. & E. 360); *Brush* v. *Miller* (13 Barb. 481); *Fenn* v. *Timpson* (4 E. D. Smith, 276); *Newstadt* v. *Adams* (5 Duer, 43); *Arent* v. *Squire* (1 Daly, 347.)

All the cotton having been safely delivered in New York, at the place where the appellants were bound to deliver the same, the duties of the appellants as carriers, under their contract or otherwise, in reference to the transportation thereof, were in every particular fulfilled and discharged. (*Garside* v. *Proprietors Trent & Mersey Navigation*, 4 T. R. 581; *Hyde* v. *Proprietors Trent & Mersey Navigation*, 5 T. R. 398; In re *Webb*, 8 Taunt. 443; *Chickering* v. *Fowler*, 4 Pick. 371; *Hemphill* v. *Chenie*, 6 Watts & S. 62; *Van Santvoord* v. *St. John*, 6 Hill, 157; *Fisk* v. *Newton*, 1 Denio, 45; *Thomas* v. *Boston & Providence R. R. Co.* 10 Met. 472; *Lewis* v. *Western R. R. Co.* 11 Met. 509; *Sawyer* v. *Joslin*, 20 Verm. 173; *Stone* v. *Waitt*, 31 Maine, 409; *Goold* v. *Chapin*, 10 Barb. 612; *Farmers & Mechanics' Bank* v. *Champlain Trans. Co.* 23 Verm. 211; *Smith* v. *Nashua & Lowell R. Co.* 7 Foster, 86; *Norway Plains Co.* v. *Boston & Maine R. R. Co.* 1 Gray, 263.)

The appellants insisted that the present case did not fall within the rule of law which governed the decisions in those cases where carriers were held responsible as such, and the goods held not to have been delivered by them until the lapse of a reasonable time after arrival at the terminus. In this case, the delivery having been completed according to the contract, by landing the cotton safely at the depot, the jury were misled by the judge, in his instruction to them, that the appellants' liability as carriers continued after the cotton was so delivered, and until the consignees were enabled to remove the same therefrom.

*As to the Measure of Damages.*—The bills of lading of the

cotton contained a special stipulation and condition that " when losses occur, for which the carriers may be *responsible* under the bill of lading, the cost or value of the property at the date of shipment shall govern the settlement of the same." The Judge charged the jury that if the appellants were *responsible* for the loss, the respondents were entitled to recover the market value of the cotton at the city of New York at the time when the same should have been delivered here—the provision in the bill of lading, in the opinion of the Judge, referring only to an *amicable* settlement of a loss, and not being applicable when a settlement was refused, and the party driven to his suit. Further, the Judge charged, that in addition to allowing the market value of the cotton in New York, the jury might or might not, as they thought proper, add to that value, interest from the 7th of August, 1864. Upon a sound construction of the bill of lading, the parties must be held to have themselves assessed the damage which, in the event of a loss occurring, for which the carriers were responsible, the respondents could recover, being the cost of the cotton at the date of shipment. If the construction given by the Judge to this provision in the bill of lading be correct, the carriers, when a loss occurred, would be compelled to waive all questions as to their responsibility ; otherwise, they would forfeit all benefit from the stipulation.

The plain import of the stipulation is that the cost or value at Cairo shall govern the *amount* for which the carriers are responsible. The question of responsibility was *alone* left open by the contract.

*Luther R. Marsh*, for respondent.

I. The burden of proof was on the defendants to show, not only that the loss was occasioned by fire, but also that the fire and the loss were occasioned without any negligence or want of ordinary care on their part.

Assuming that common carriers can restrict their liability by special contract, and that the defendants have done so to some extent by these bills, it is doubtful whether they can so

restrict it as to relieve themselves from liability for loss resulting from their own negligence or want of ordinary care, and it is certain that to do so, the intention must be clearly expressed in the contract itself. (*Alexander* v. *Greene*, 7 Hill, 533; *Wells* v. *The Steam Nav. Co.* 8 N. Y. 375, 380; *New Jersey Steam Nav. Co.* v. *Merchants' Bank*, 6 How. U. S. 344; *Hooper* v. *Wells*, 5 Am. Law Reg. N. S. 16; *Smith* v. *N. Y. Central R. Co.* 29 Barb. 132; *Michaels* v. *N. Y. Central R. Co.* 30 N. Y. 564; *Read* v. *Spaulding*, 30 N. Y. 630; *Wing* v. *N. Y. & Erie R. Co.* 1 Hilt. 235.) Whatever cases seem to hold a different rule will be found to be cases where the liability as *common carriers* was entirely out of the question—cases where the goods were delivered under special acceptance to be " transported at the owner's risk;" or where the carrier was not to be liable beyond a certain amount; or cases of similar character, in all of which the obligations assumed by the carrier were in the whole but those of ordinary bailee, and his liability was to be regulated by the rules which govern that relation. An ordinary bailee who assumes to transport goods under special agreement, at the owner's risk, acts in quite a different capacity from a common carrier, acting as such, who claims a certain and specific exemption from liability for loss occurring in one particular manner. One is governed by the rules which regulate the responsibility of such bailees; the other by the rules which regulate the liability of common carriers as such. (*Turney* v. *Wilson*, 7 Yerger, 340; *Whitesides* v. *Russell*, 8 Watts & Serg. 44; *Singleton* v. *Hilliard*, 1 Strobhart, Law, 203; *Swindler* v. *Hilliard*, 2 Richardson, 286; *Roberts* v. *Riley*, 15 Louisiana Ann. 103; *Slocum* v. *Fairchild*, 7 Hill, 292; *Parsons* v. *Monteath*, 13 Barb. 353.)

The rule deduced from the above authorities may be stated thus: Whenever a common carrier seeks to free himself from liability by reason of an exemption created either by the common law or express contract, he must show both that the loss was occasioned by the cause mentioned in the exemption, and that he was free from all fault, negligence, or want of ordinary care. The burden of proving both propositions is on the carrier.

II. Even if the defendants sustained the relation of ordinary bailees for hire, they were nevertheless bound to show, in this particular case, that the loss did not occur through their negligence. The meagerness of authority probably results from the fact that this question is seldom brought squarely before the court; that in most cases the evidence as to excuse for nondelivery and as to want of care is coincident, and when the bailee attempts to show his excuse for nondelivery, he necessarily brings up the question of negligence, and the court has to decide that question on the evidence, without regard to the question of burden of proof. (*Platt* v. *Hibbard*, 7 Cowen, 497; *Foote* v. *Storrs*, 2 Barb. 327; *Harrington* v. *Snyder*, 3 Barb. 380.) See *Beardslee* v. *Richardson* (11 Wend. 25, 27); *Logan* v. *Matthews* (6 Barr, 417.)

This question was well and elaborately considered in the case of *Swindler* v. *Hilliard* (2 Richardson, 286); and in this court, in *Arent* v. *Squire* (1 Daly, 347.)

III. The defendants were liable for ordinary negligence, or want of ordinary care, provided such negligence or want of care contributed to the loss, because the receipts or bills of lading do not, in terms, exempt them from liability for negligence or want of ordinary care. (*Alexander* v. *Greene*, 7 Hill, 533; *Wells* v. *Steam Nav. Co.* 8 N. Y. 375; *Smith* v. *N. Y. Central R. Co.* 29 Barb. 132; *Hooper* v. *Wells*, 5 Am. Law. Reg. N. S. 16; *Sager* v. *Portsmouth &c. R. Co.* 31 Maine, 228; *Swindler* v. *Hilliard*, 2 Richardson, 286.)

IV. The plaintiff's consignees had a reasonable time, after notice of its arrival, to remove the cotton, and until such time had elapsed the liability of defendants continued. What was such reasonable time, was a question solely for the jury, in view of all the circumstances of the case. (*Price* v. *Powell*, 3 N. Y. 122; *Clendaniel* v. *Tuckerman*, 17 Barb. 184; *Barclay* v. *Clyde*, 2 E. D. Smith, 95; *Hill* v. *Humphreys*, 5 Watts & Serg. 123.) If their liability as common carriers had ceased, the defendants were liable, as depositaries or warehousemen, for want of ordinary care. (*Clendaniel* v. *Tuckerman*, 17 Barb. 184; *Goold* v. *Chapin*, 20 N. Y. 259.)

V. The measure of damages was the value of the cotton burned at New York, the place where it should have been delivered. To this amount the jury may, if they see fit, add interest, which is a matter solely in their discretion. (*Watkinson* v. *Laughton*, 8 Johns. 213; *Amory* v. *McGregor*, 15 Johns. 24; *Kent* v. *Hudson River R. Co.* 22 Barb. 278; *Medbury* v. *N. Y. & Erie R. Co.* 26 Barb. 564; *Van Winkle* v. *U. S. Mail Steamship Co.* 37 Barb. 122, 123; *Marshall* v. *N. Y. Central R. Co.* 45 Barb. 502.)

VI. The bills of lading or receipts do not constitute contracts or agreements binding on the plaintiffs, and exempting the carriers as therein mentioned, because there is no proof of assent to their terms by the plaintiffs, and such assent cannot be implied from the instruments themselves, and the burden of proving such assent is on the carrier.

Whatever may be the effect of these receipts and bills, the defendants in this action cannot take advantage of them. (1.) Because the receipts issued by the Illinois Central Railroad are confined in their effect to that road. (2.) Because the receipts issued by the Union Transportation Company were not in any sense authorized by the plaintiffs, or received by them, or any authorized agents of theirs. (3.) Because the defendants, being a monopoly, should not be allowed to restrict their common-law liability.

DALY, F. J.—The defendants, by their special agreement, qualified their liability as common carriers in two particulars.

*First.* They were not to be responsible for a loss by fire.

*Second.* If responsible for loss, the cost or value of the property at the time of shipment was to govern in the settlement of the loss. They did not by this agreement divest themselves of their public character as common carriers, but the effect of it was simply to exempt them from liability, if the property should be destroyed by fire, without fault or negligence on their part (*Swindler* v. *Hilliard*, 2 Richardson R. 286; *New Jersey Steam Nav. Co.* v. *Merchants' Bank*, 6 How. U. S. 344).

It was not enough for the defendants, in their exoneration,

to prove that the property was destroyed by fire, but they were bound to go further, and show that its destruction by that element was without any fault on their part. This involved the necessity of showing how the fire and consequent destruction of property occurred, and what means, if any, were taken to prevent it or avert its effects. The owner is not to be presumed to know what was done by the carrier or his agents in the care and preservation of the property, but the carrier knows, or ought to know, as he has peculiarly within his power the means of knowledge, and it is for him to show it. The responsibility should be upon the one who can most easily discharge it; and it is more reasonable to require the carrier to prove, in his examination, that due care was exercised, than to impose upon the owner the obligation of proving the want of it (*Singleton* v. *Hilliard*, 1 Strobhart, Law, 203 ; *Hays* v. *Kennedy*, 3 Grant (Penn.), 351 ; *Swindler* v. *Hilliard, supra ; Arent* v. *Squire*, 1 Daly, 347 ; *Parsons* v. *Monteath,* 13 Barb. 354 ; *Tardos* v. *Toulon*, 14 La. An. 229 ; *Smith* v. *New York Central Railroad*, 43 Barb. 229). "The general rule undoubtedly is," says Mr. Justice Johnson, in the case last above cited, " that the burden of proof is always upon the party who asserts the existence of any fact which infers legal responsibility. But the exception is equally well established, that in every case the *onus probandi* lies upon the party who is interested to support his case by a particular fact which lies more particularly within his knowledge, or of which he must be supposed to be cognizant." The ruling of the court, therefore, that the burden of proof was upon the defendants to show that the destruction of the cotton by fire was not caused by negligence on their part, was correct, and the exception was not well taken. The fire originated in a steamboat used by the defendants in the transportation of freight. The steamer was lying at the wharf upon which the defendants' depot for the reception of freight was erected, and the fire, when discovered, had obtained such headway, and its course was so rapid, owing to the prevalence of a high wind, that it was communicated to the depot, which, with its contents, was destroyed, the means resorted to by the defendants' agents and others, to arrest the progress of the fire proving ineffectual. It did not

appear upon the trial how the fire originated in the steamboat, and it may be that the defendants did not know, or that they gave all the proof in explanation of it that it was in their power to offer; but this would not suffice, if the fire might have been prevented by that degree of care on their part which ought to have been exercised to guard against the occurrence of such accidents.

Pothier, in his *Traité du Contrat de Louage* (§§ 193, 194), after remarking that the occupant of a house is, with respect to its preservation, answerable, not only for his own negligence, but also for that of his family, and for the servants and work-people whom he employs there, says that as a fire ordinarily happens in a house through the fault of the persons who live in it, it may fairly be presumed, when one occurs, that it was owing to the fault of the occupier or his servants, and he is therefore held to make good the loss, unless he can show that it arose from inevitable accident (*cas fortuit*), or was communicated from another building—a rule that would be quite as applicable to a carrier or any other bailee for hire as to the lessor of a house. If the carrier cannot explain how the fire occurred which destroyed the property entrusted to his charge, it is quite as consonant with justice to presume that it must have arisen through the negligence or want of proper care of himself or of his agents as to presume that it was the result of inevitable accident. Or if no presumption is to be indulged in where the cause of the fire is not or cannot be explained, it may at least be said that it is incumbent upon the carrier to show that he exercised all the care and diligence for the safety of the property that could be reasonably expected of him under the circumstances.

The jury in this case must be regarded as having found that the defendants did not exercise that degree of care which was required of them to guard against such accidents. The judge told them that the burden was upon the defendants to satisfy them that the loss by fire was not occasioned by negligence on their part; that if the defendants omitted to take that degree of care which persons of ordinary prudence would naturally take of such property under such circumstances, and if that occasioned or contributed to the loss, the defendants were

liable; to which the defendants excepted. This was substantially instructing the jury that the defendants were bound to exercise ordinary care and diligence (Story on Bailments, § 11; Edwards on Bailments, 3), which is the law in respect to bailees for hire; and they did not exercise it, if the want of it occasioned or contributed to the loss. The exception, therefore, to this part of the judge's charge was not well taken. The jury, after having retired to deliberate, sent the following question in writing to the judge: "If we are satisfied the proper precaution was not taken to prevent fire on board, through the neglect to place a watchman there, are we to find for the plaintiffs for the whole amount?" Upon which the judge instructed them that "the omission to place a watchman actually on the boat, specially charged with the duty of guarding her, might be considered by the jury on the question of negligence in the case," to which instruction the defendants excepted.

It was no error on the part of the judge to tell the jury that they might take this circumstance into consideration, for it was for the jury to determine upon all the circumstances whether there was a want of ordinary care and diligence or not.

Ordinary care is generally defined by the text-writers to be the common prudence which men of business, or heads of families, ordinarily take of their own property, or usually exhibit in the management of their own affairs. But the intrinsic difficulty of reducing what it is within the limits of a definition, is such that it becomes, as Judge Story has remarked in his work upon Bailments (§ 11), "less a matter of law than of fact." In nearly every instance where the question arises, it involves the question, what should or should not have been done by the party upon whom the obligation was imposed; and this is usually a question that can be properly determined only by a consideration of all the circumstances, and one that a jury is generally quite as competent to pass upon as a court. The rule that the bailee must take the same care as men of common prudence usually take of their own property, or exhibit in the management of their own

affairs, is to a certain extent a guide, but it is a very vague one. It is a test founded upon that kind of knowledge or experience which is common to all mankind, and of which the twelve men in the jury-box may have as much, or more, than the judge. In *Crook* v. *Jadis* (5 Barn. & Ad. 909), where the question was whether the defendant was answerable or not for gross negligence, Taunton, J., said : "I cannot estimate the degree of care which a prudent man should take." In *Vaughan* v. *Menlove* (3 Bing. N. C. 468), where the same question arose, Chief Justice Tindal said : "The care taken by a prudent man has always been the rule laid down ; and as to the supposed difficulty of applying it, a jury has always been able to say whether, taking that rule as their guide, there has been negligence on the occasion in question." In *Storer* v. *Gowen* (18 Maine, 174), where there was the same question, it was held that it was the province of the jury, and not of the court, to pass upon it ; and in *Whitney* v. *Lee* (8 Met. 91), Chief Justice Shaw held that as it is difficult to mark the lines of distinction between different degrees of negligence, so as to show precisely where the one begins and the other ends, therefore, by the common law, it is left to the jury to say, under the circumstances, whether the particular case is under the one or the other. These, it is true, are cases where the question involved was not the existence of negligence, but the degree of it ; but the reasons upon which they are founded apply equally, in my opinion, in a case where the existence of negligence depends upon the question whether the degree of care was taken which men of common prudence take of their own property. In a recent case (*Philadelphia Railroad Co.* v. *Spearen*, 47 Penn. St. 300), the court held that there is "no absolute rule as to what constitutes negligence ; conduct which might be so termed in one case being in another considered as ordinary care ; that it is therefore always a question of fact for the jury, under the instruction of the court, as to the relative degree of care, or the want of it, growing out of the circumstances and conduct of the parties." And Angel, in his work on Carriers (§§ 51, 184), gives it as the result of his examination of the authorities, that in most cases the question of ordinary negligence

is more a question of fact to be determined by the jury than of law. The opinion of Judges Johnson and Mason, in the respective cases of *Ireland* v. *Oswego Railroad Co.* (13 N. Y. 533), and *Keller* v. *New York Central Railroad Co.* (24 How. Pr. 177), were to the effect that what constitutes negligence is an inference of the mind from the facts and circumstances of the case; that, as minds are differently constituted, the inference from a given state of facts will not always be the same; and that, therefore, though all the witnesses may agree in their statement, the true course is to leave the determination of the question to the jury, under proper instruction, unless the facts are so clear and decided that the inference is irresistible. " If it is necessary," says Judge Selden, in *Bernhardt* v. *Rensselaer & Saratoga Railroad Co.* (23 How. Pr. 168), " to determine, as in most cases it is, what a man of ordinary care and prudence would be likely to do under the circumstances proved : this involving, as it generally must, more or less of conjecture, can only be settled by a jury;" and Judge Porter, in *Ernst* v. *Hudson River Railroad Co.* (35 N. Y. 40), remarking upon the liability of judges to differ, and pointing to the fact that, even in the cases which have been held so plain as to justify a nonsuit, there have been few in which the judges have not themselves disagreed, pertinently asks if judges " are less liable to err than jurors on questions of pure fact pertaining to the ordinary affairs of life." " Our law," he continues, " is framed upon the theory that upon such questions the citizen can rely with more security on the concurrent judgment of twelve jurors than on the majority vote of a divided bench. Unanimity is not required in our decisions upon questions of law. It is otherwise with jurors charged with the determination of questions of fact ; and such questions should not be withheld from the usual arbitration, unless the evidence leads so clearly to one result, that there is no room for honest difference between intelligent and upright men."

From the very nature, therefore, of the subject-matter; from the difficulty of a judge applying to the circumstances such a test as the care which men of common prudence ordinarily exhibit, and determining upon a given state of facts as

matter of law, that it was exercised or that it was not, in which his judgment may be no better than that of the men who are sitting upon the jury; and from the fact that where such a test is to be applied, every case must be determined more or less upon its own circumstances, there can be no better course than to leave such a question to be settled by the jury, the united judgment of the twelve men who compose the jury being as certain and as satisfactory a mode of determining it as for the court to undertake to work it out upon the facts by a course of legal reasoning.   It may be that a judge can say upon the facts proved that there is not one which could have any tendency to show the want of that care which the law demands, or that the failure to exercise it has been so conclusively shown that there is nothing which the jury could consider; " but such instances," as was said by Judge Selden, in *Bernhardt* v. *Rensselaer & Saratoga Railroad Co.* (*supra*), " must be rare;" and that they are so has been the result of my observation, having had a long experience in the trial of actions involving such questions.   As a general rule, therefore, where the liability of the bailee turns upon the point whether the loss or injury were owing to the want of ordinary care and diligence on his part, it should, even where there is no conflict as to the facts, be left to the jury to determine, giving them the rule above referred to as their guide; and their verdict should be regarded as decisive and final upon such a question, unless the case is one warranting the conclusion that they must have been influenced in their verdict by other motives than the consideration of the circumstances arising upon the evidence.

When the fire was discovered, the smoke was issuing from the guards of the boat, and came out through a grating upon the forward deck, near one of the boilers, and in the vicinity of the fire-room.   When the engineer came upon the deck, the fire was coming out, as he testified, through a small rod, and had broken out through a small hole alongside the boiler.   He cut a hole in the deck with an axe at the deck rod, a place where the fire came from, about fifteen feet forward of the boiler, when instantly the flames rushed up to a height of nearly six feet, and in ten minutes the deck was on fire.   In five min-

utes the pier caught, and in less than half an hour the boat and the depot were in flames, the fire running all over, in the language of one of the witnesses, "like a tinder-box, so that water had no effect upon it." The defendants showed satisfactorily that it did not originate in the fire-room, and also that the forward boiler had been washed out and the fire in the furnace extinguished at least twelve hours before the discovery of the fire. It was discovered at midnight, between half-past twelve and one o'clock, the engineers, hands, and all on board being at the time asleep in their beds. The assistant-engineer was below, in the vicinity of the fire-room, as late as nine o'clock in the evening, and there was no indication there at that time, by sight or smell, of the existence of fire; but, in little more than three hours after, it had occurred, and attained to such a magnitude as to be beyond control.

It would not be an unreasonable assumption on the part of the jury to conclude upon this state of facts that the fire originated through the negligence of some one on board the steamboat. There was no indication of it at nine o'clock in the evening in the vicinity from whence it was proceeding when discovered, and where it probably originated; and no person was shown to have been on board the boat during the evening but those attached to the vessel.

But there is no occasion to dwell upon this view of the case, as the jury have very clearly indicated by the point upon which they requested instruction, and by their verdict, that in their opinion there was a want of ordinary care and diligence on the part of the defendants in not maintaining a watch throughout the boat during the night, to guard against accidents by fire, and that if that had been done the fire would not have occurred, or its extending could have been prevented. It was shown that the boat—the running of which was only temporarily suspended during Sunday—was lying close against the pier, upon which was the depot, containing a large quantity of combustible materials, such as cotton, hemp, barrels of oil, of whiskey and of wine, boxes of candles, tierces of lard, &c., the roof of the building being covered with, or having so much tar upon it, that, in the language of one of defendants' witnesses,

" it went like a match." The defendants kept four night watchmen upon the pier to protect the property from theft and to guard against accidents by fire. They were all on duty when the fire was discovered, and one of them had charge of the boat, but he did not go below the deck, his duty being to watch the freight upon the boat and look after her lines and tackle. It was his practice to go around every hour, and sometimes more frequently, and if he heard any noise, or anything which attracted his attention, to go on board of the boat. The precautions taken to guard against accidents by fire upon the pier seem to have been ample, but the jury were evidently of opinion that they were not sufficient to guard against it on board the boat; and as the boat was lying close to a depot in which there was a very large quantity of combustible materials, it was certainly, as the event proved, leaving the depot in imminent peril if the boat should take fire at night when all on board of her had retired to rest. A steamboat in which fire is used as the means of propelling her, and is in use more or less for the convenience and wants of those who are employed upon and live on board of her, may require greater watchfulness to guard against accidents of this nature than was bestowed upon this occasion; at least, so the jury thought, and we cannot, as matter of law, say that they erred in coming to that conclusion. In view of the peril, in view of the boat's taking fire, of the danger in that event, to which the depot was exposed, from the quantity of tar upon the roof, and the combustible nature of the goods stored in it, it was evidently, in the judgment of the jury, required, in the exercise of ordinary care and diligence on the part of the defendants, that they should have kept up a watch throughout the boat during the night, or at least after the officers and men had retired to rest; and of the propriety or necessity of this, as an act of common prudence on the part of the defendants under the circumstances, for the preservation and safety of the property, the twelve men who sat upon the jury were as competent to judge as this court could be.

"Diligence," says Story, " is usually proportioned to the degree of danger of loss; the danger is, in different states of society, compounded of very different elements, and the custom of trade

.and the course of business have an important influence" (Story on Bailments, § 14). The judge, in his instructions to the jury, brought the question down to this standard, by telling them that if the defendants omitted to take that degree of care which persons of ordinary prudence would usually take of *such property, under such circumstances*, the defendants were liable. This was certainly all that the defendants could ask as matter of law from the court, and the united judgment of the jury that they did not do this should be treated by us as decisive.

It is claimed that the judge erred in telling the jury that if the omission of the defendants to exercise ordinary care and diligence contributed to the loss, the defendants were liable. This was excepted to, but the exception was not well taken. I have already stated that the defendants did not, by their special agreement, divest themselves of their public character as common carriers, for their extraordinary liability remained, except in the case of a loss by fire.

The effect of the stipulation they entered into was simply to put that peril upon the same footing as a loss by the act of God or the public enemies, from which the law exempts them; and the same rule should be applied that is applied in that case —that, to entitle him to the exemption, the carrier must be himself without fault (*Read* v. *Spaulding*, 30 N. Y. 630). The act of negligence may have been remote, but, if it contributed to the injury, he is answerable. "To avail himself of such exemption," says Davies, J., in the case above cited, "he must show that he was free from fault at the time." "His act or neglect," says Woodruff, J., in the same case (5 Bosw. 408), "must not *concur and contribute* to the injury." "No wrongdoer," says Tindal, C. J., in *Davis* v. *Garrett* (6 Bing. 716), "can be allowed to *apportion* or *qualify* his own wrong."

If, therefore, the negligent act or omission of the defendants, in the language of the judge, contributed to the loss, it was not for the court or the jury to measure in what proportion or degree, if the act or omission was in itself a want of ordinary care and diligence; unless, as was said by Tindal, C. J., in the case above cited, the loss or injury *must* have happened, notwithstanding the act or omission complained of. The cases upon

which the defendants' counsel rely for the proposition that the loss must have arisen *solely* from the defendants' negligence, are cases where the point involved was co-operating or contributing negligence on the part of the plaintiffs, and do not apply.

The liability of the defendants as carriers continued after the cotton was deposited in the depot, until a reasonable length of time was afforded to enable the plaintiffs to take it away; and what was a reasonable length of time, under the circumstances, was a question for the jury. (*Congar* v. *Galena &c. Railroad Co.* 17 Wis. 477; *Jackson* v. *Sacramento &c. Railroad Co.* 23 Cal. 268; *Morris &c. Railroad Co.* v. *Ayres*, 5 Dutch. N. J. 393; *New Albany Railroad Co.* v. *Campbell*, 12 Ind. 55; *Garside* v. *Trent Nav. Co.* 4 T. R. 581; Angel on Carriers, §§ 284, 287, 303.) This rule was in no way affected by the provision in the contract that the cotton was to be delivered at the defendants' depot; for a delivery there, upon notice to the plaintiffs, would have sufficed, if no such stipulation had been made (*Thomas* v. *Boston &c. Railroad Co.* 10 Met. 472).

In my judgment, the question, upon which so much evidence has been given upon the trial, and which has been so elaborately discussed upon the argument, whether or not a reasonable length of time had elapsed, is not material, if the destruction of the property by fire was attributable to the want of ordinary care and diligence on the part of the defendants. Fifty-nine bales arrived on Saturday, of which no notice was given to the consigeees or opportunity afforded them to remove them; and as respects the other seventy-nine bales, which were left over after three o'clock on Saturday afternoon for the plaintiff's convenience, the defendants were, under the circumstances, to be regarded as bailees, bound to the exercise of ordinary care and diligence.

In *Thomas* v. *Boston &c. Railroad Co.* (10 Metc. 472), a carefully considered case, the goods had, as in the present case, been partially taken away, and the residue was left in the depot for the plaintiff's convenience. No agreement was made for the storage of what was left, nor any compensation paid for taking care of it, the sum paid being the freight for its carriage,.

Lamb v. The Camden and Amboy Railroad and Transportation Company.

which was payable at the delivery of the goods, upon the arrival of the cars. Upon this state of facts, a portion of the goods left having been lost, the court held that the relation of the defendants as common carriers had °ceased, and that they were responsible only for the want of ordinary care and diligence in tho custody and safe-keeping of the goods. (See, to the same effect, *Roth* v. *Buffalo &c. Railroad Co.* 34 N. Y. 553, 554; and *Clendaniel* v. *Tuckerman,* 17 Barb. 189, 190.)

But if the question of reasonable time was material, there was nothing in the ruling of the court of which the defendants have a right to complain.

An exception was taken as to the propriety of leaving it to the jury to determine whether a reasonable length of time had elapsed or not, upon the ground that, as there was no conflict upon the evidence, it was to be decided by the court purely as a question of law. It was said by Judge Smith, in *Roth* v. *Buffalo &c. Railroad Co.* (*supra*), that when there is no dispute as to the facts, the question is purely one of law, and that the court should decide it; but the authorities quoted by the judge do not sustain that proposition in the broad terms in which he has laid it down. They relate mainly to the question of what is reasonable notice of the dishonor of a bill, which, when the facts are undisputed, is a question of law, from the necessity of having some fixed legal standard in respect to bills and promissory notes, that commercial men may know the law and be enabled to protect themselves (*Bryden* v. *Bryden,* 11 John. 187).

But what is a reasonable time within which goods deliverable at the warehouse or depot of the carrier must be taken away, is a question more or less dependent upon circumstances—such as the nature of the goods, the mode of doing business, as well as other considerations, upon which men equally intelligent may come to different conclusions; making it especially appropriate that such questions, as a general rule, should be determined by the jury, and not by the court. "The question," says Angel, " of what is requisite to constitute a competent delivery by the carrier, or such a delivery as will determine the transit and dissolve his liability, in a great measure is left to

the jury to determine " (Angel on Carriers, § 282). What is a
reasonable length of time in cases of demurrage, is determined
upon all the circumstances legitimately bearing upon the case,
and is a question for the jury (*Cross* v. *Beard*, 26 N. Y. 89,
92). A case may arise in which the court can say at once, as
matter of law, that more than a reasonable length of time has
elapsed, as in *Nudd* v. *Wells* (11 Wis. R. 407), where a pack-
age was to be conveyed by a carrier from Boston to Milwaukie,
and a year had gone by without his delivering it; but in the
great majority of cases, the question should be left to be deter-
mined by the jury, and the present is not one which should be
an exception to such a rule.

Several exceptions were taken to what the judge said to
the jury upon the question of reasonable time. After reading
the passages excepted to, I do not think that the judge meant
that any of the circumstances to which he referred were to be
taken by the jury as conclusive in law upon the question as to
what would or would not be a reasonable time, or that he
meant to give them any positive instruction founded upon the
circumstances upon which he commented. If I am mistaken
in this respect, and his language is capable of a different con-
struction, and the effect of it was to take away from the jury
the consideration of any of the circumstances and dispose of
them as questions of law, then it is sufficient to say that the
effect of this part of his charge was entirely obviated (*Stoddard*
v. *Long Island Railroad Co.* 5 Sandf. 189), and made nugatory
by his response to the question which was afterwards submitted
to him in writing by the jury: " Does the law specify any pe-
riod as a reasonable time, or is it fixed by custom ? " To which
he answered, " Neither the law nor any custom proven in this
case defines what is a reasonable time. The jury must deter-
mine *that as a fact from all the circumstances* of this particular
case." The determination of it by the jury as a fact necessarily
excluded the consideration of any circumstances as matter of
law, and left the disposition of the whole question entirely to
the jury.

The remaining questions relate to the admission and rejec-
tion of evidence and to the measure of damages. The plaintiff

was allowed to read the charter of the defendants, from the Session Laws of the State of New Jersey, to show that the defendants had the exclusive right of transportation, by railroad, across the State of New Jersey, for the purpose of raising the point that the defendants could make no contract in derogation of their common-law liability, and because it bore upon the question of delivery in the city of New York. There was no question in the case respecting a delivery in New York, except so far as it was involved in the question whether a reasonable length of time had or had not elapsed for the consignees to remove the cotton from the depot; a question, as I have already said, which was immaterial, if the destruction of the cotton was owing to the want of ordinary care and diligence on the part of the defendants; for, if that was exercised, the defendants were not liable at all; and as the court ruled against the plaintiff upon the other ground, holding that the defendants could limit their liability, the reception of the testimony could have no bearing upon any of the points on which the defendants relied for their defence. The charter is not printed in the case, and therefore we cannot say that there was anything in it which necessarily had, or which possibly might have had, an effect upon the minds of the jury, and influenced their verdict. The extreme length to which our courts formerly carried the practice of granting new trials, where incompetent evidence was admitted, which might, though it probably did not, affect the verdict (*Underhill* v. *New York & Harlem Railroad Co.* 21 Barb. 489; *Farmers' Bank* v. *Whinfield*, 24 Wend. 427), has operated very injuriously, and tended more to delay and obstruct than to aid the administration of justice. Of late years the courts of this and other States have shown a disposition to depart from this rigid and very technical rule. If evidence was rejected that ought to have been received, or evidence received that ought to have been rejected, the defendants are entitled to a new trial, is, says Wright, J., in *Forrest* v. *Forrest* (25 N. Y. 510), " hardly the rule now in a court of law; for, latterly, even these courts undertake to judge for themselves of the materiality of evidence found to have been improperly admitted or rejected, and when satisfied that no injustice has been done, and that

the verdict would have been the same with or without such evidence, they have refused a new trial."

It was wholly immaterial what instruction the defendants had given to their agents. The question was, what was done by these agents? for, if the agents had neglected to follow these instructions, the defendants would still have been answerable, and if the agents fulfilled them, it was an easy matter to prove what they did. This the defendants were allowed to show, and did show very fully. The watchmen testified what was the nature of their duties, and what they did in the discharge of them, which was all that was material. As all the other exceptions taken to the reception or rejection of evidence, save one, are not mentioned in the defendants' points, and were not referred to upon the argument, we may assume that they are abandoned and need not be reviewed.

The remaining one relates to the reception of evidence as to the value of the cotton in New York, the place of delivery, and may be reviewed in connection with the rule which the judge laid down in his charge as to the measure of damages. He told the jury that the provision in the contract that the value of the property at the date of the shipment should govern in the settlement of the loss, referred to an amicable settlement of it; that it did not apply where a settlement is refused and the party is driven to his suit; and that the plaintiff, if he recovered, was entitled to the market value of the cotton in the city of New York at the time when it should have been delivered. This, I think, was erroneous. There is nothing in the language of the contract that would warrant the putting of such a qualification upon it. It refers to the occurrence of losses for which the defendants *may be responsible*. The settlement—that is, the adjustment and payment of the loss—is made dependent upon the question whether they are responsible for it or not, and the contract does not provide how that is to be ascertained. If it is in doubt, or in dispute, and the parties cannot agree, it can be determined only by the decision of a court of law, or by a mutual agreement to refer it to arbitration; but, under the construction given by the judge, the defendants, when a loss occurred, would be compelled to waive all question as to their

Lamb v. The Camden and Amboy Railroad and Transportation Company.

responsibility, or lose the benefit of the stipulation which they had made. The language used will not bear such an interpretation. The obvious meaning is: when it is ascertained that they are responsible for a loss that has occurred, which, after inquiry, they may satisfy themselves is the fact, and admit, or which, doubting or disputing, they may leave to be decided by a resort to the ordinary tribunals, that they are to be answerable only for the value of the cotton at the date of its shipment. It is said in the case, that the cost of the cotton when it was shipped was proved by the bills of the purchaser which are in evidence. If the plaintiff, therefore, so elects, the verdict may be reduced to the value of the cotton at the time of shipment, and affirmed for that amount; if not, a new trial will have to be ordered.

Brady, J.—The defendants are not, by the contract of carriage, to be responsible for a loss by fire, unless it can be shown that it resulted from their negligence or want of care. This condition of liability was enforced in terms on the trial. The defendants were held not to be responsible, unless it satisfactorily appeared that they were guilty of negligence by which the loss was occasioned. Whether the plaintiff is to make out a *prima facie* case in the first instance, is not stated by the contract itself, and the natural order of proof would be for the plaintiff to show the delivery to the carrier, and his failure to carry and deliver as undertaken by him, and by way of answer to any explanation of the loss by him, to further show that it resulted from his negligence, notwithstanding the explanation.

There is nothing in the contract hostile to this form of procedure, or in conflict with it. The carrier is to be liable only for negligence resulting in loss when the loss is occasioned by fire. This is a condition imposed by him; this the limit within which he restricts the common-law liability which would otherwise exist; and when fairly considered, with reference to that common-law liability thus restricted, it means: "Upon a fair and full consideration of all the facts attending the loss, if it appears that I was negligent, and that such negligence resulted in the destruction of your property, I will pay you the damages to be ascertained as agreed upon."

It would be a severe exercise of judicial power to hold that the consignor must give evidence, not only of the cause of the loss, but the details attending it, and be also required to establish from such details the want of such care on the part of the carrier as he was called upon to exercise under his engagement in respect to the property carried. Such a duty should not be imposed, unless there can be no doubt that such was the intention of the parties, and for the reasons—

1st. That the circumstances attending the loss are more within the knowledge of the carrier, and information on the subject more accessible to him than to the consignor; and,

2d. Because the carrier is *prima facie* liable if he failed to deliver, and any limited responsibility being for his especial benefit, he should have the burden of bringing the loss complained of within the exception to his general liability.

The defendants in this case were required, in answer to the plaintiff's demand, to bring themselves within their excepted liability, and this was a proper construction of the terms of carriage. I agree with Judge Daly, therefore, in his conclusions upon that branch of the case.

It must be said, in addition, however, that the defendants did not rest upon their proposition that the plaintiff must show them guilty of negligence. They excepted to the denial of the motion to dismiss the complaint, it is true, but they proceeded, nevertheless, to show the cause of the fire, and all the circumstances calculated to relieve them from the charge or suspicion of negligence. The plaintiff responded to the case made by such evidence, and the issue on that subject was fairly considered, and passed upon adversely to them. The proof having thus been given on both sides, the refusal of the judge at the trial to compel the plaintiff to establish a *prima facie* case of negligence against the defendants resulted, and is to be regarded merely, as an inversion of the order of proof, which could not operate to the prejudice of the defendants.

The circumstances under which the fire took place, its cause and consequence, as already suggested, must be supposed to have been more within the knowledge of the defendants than the plaintiff, and the evidence on the trial shows that such supposition was entirely justifiable. Such facts and circumstances

would necessarily present the defence, or the conclusion based upon them, if proper, that the defendants were not guilty of negligence. It may be said in answer to this view that the plaintiff might not have been able to show that the defendants were guilty of negligence in opening his case ; but the fact that he rebutted the defendant's case made on that subject, and was allowed to go to the jury upon the answer made to it, shows that such a conclusion could not be properly entertained. We have the whole case before us, and it does not appear that the inversion of the order of proof, assuming such an incident to have occurred, prejudiced the defendants in any manner. They had the opportunity to present their case fully, and seem to have done so, and the jury found against them. For these reasons, and those assigned by Judge Daly on the other questions considered by him, the judgment should be affirmed.

[Subsequently, upon a reargument being had upon the question of the rule as to the measure of damages under the contract, the court reconsidered its decision on that question, with the following opinion.]

DALY, F. J.—The receipt or bill of lading which the Illinois Central Railroad Company gave at Cairo is the written evidence of the contract which that company made for the transportation of the cotton, to which may be added the statement of the plaintiff, Lamb, that the agent of that company told him that it would take the cotton for two dollars per hundred pounds, and the statement of the agent himself that he made the bargain for the transportation of the cotton from Cairo to New York with the plaintiffs. The bill of lading acknowledges the receipt of the cotton by the company, consigned to James Warrack, agent, Chicago, as marked and described in the margin, and in the margin it is consigned to Sawyer, Wallace & Co., New York ; and after the printed word "freight" there is in the margin this entry : " Through rate $2 per 100 lbs. ;" by which we understand through to New York, that being the place of destination.

In the body of the bill of lading it is provided that the company are not to be responsible for loss by fire, unless it occurs

through the negligence of their agents; and further, that it is especially understood that for all loss and damage occurring in the transit of said packages, the legal remedy shall be against the particular carrier or forwarder only in whose custody the said packages may actually be at the time of the happening thereof; it being understood that the said Illinois Central Railroad Company assumes no other responsibility for their safety or safe carriage than may be incurred on its own road.

If the word "packages" may be understood as embracing cotton bales, which I think it may, as cotton is among the articles previously referred to, and one of the definitions of "package" by Webster, is a "bale," and this bill of lading, with its qualification of the carrier's responsibility, is to be regarded as expressing the contract which the plaintiffs or their agents entered into with the Illinois Central Railroad Company, then, in my judgment, it is very plain that the responsibility of that company as common carriers ceased when they had transported the cotton over their own road to Chicago and had delivered it into the custody of a connecting line to transport it further upon its route to its destination at New York (*Detroit &c. Railway* v. *Farmers' Bank*, 20 Wis. 122; *Cincinnati &c. Railway* v. *Spratt*, 2 Duvall, 4; *Nutting* v. *Conn. River Railroad*, 1 Gray, 502; *Hunt* v. *N. Y. & E. Railway*, 1 Hilton, 228; *Penn. &c. Railway* v. *Schwarzenberger*, 45 Penn. St. 208; *Converse* v. *Norwich &c. Co.* 33 Conn. 166; *Farmers' Bank* v. *Champlain &c. Co.* 18 Vt. 140; 23 *id.* 209; *Jenneson* v. *Camden &c. Railway*, 4 Am. Law. Reg. 234; *Fenner* v. *Buffalo &c. Railway*, 46 Barb. 103).

Where the carrier to whom the property is delivered by the owner for transportation to a point beyond that carrier's route, receives, or contracts to receive, the entire freight, he undertakes for its carriage and delivery at the place of destination, and the subordinate carriers are to be regarded as his agents. Having received, or contracted to receive, the whole reward, he is bound to perform the whole service, or, rather, to see that it is performed, at the peril of his liability, as a common carrier, in the event of loss. (*Dillon* v. *N. Y. & E. Railway*, 1 Hilton, 234; *Mercantile Mutual Ins. Co.* v. *Chase*, 1 E. D. Smith, 115.)

If the freight for the entire route is reckoned in one sum, or a receipt is given for the entire route, or the rate for the whole route is agreed upon and fixed by the carrier who receives the property from the owner, it is *prima facie* evidence of an agreement to deliver it at the ultimate place of destination, but like any other presumption, may be overcome by proof that that was not the agreement (*Krender* v. *Woolcott*, 1 Hilton, 227; *Angle* v. *Mississippi Railway*, 9 Iowa, 487; *Crouch* v. *Great Western Railway*, 2 H. & N. 491; *Peet* v. *Chicago &c. Railway*, 19 Wis. 118; *Weed* v. *Saratoga &c. Railroad Co.* 19 Wend. 535; *Kyle* v. *Laurens Railway*, 10 Rich. Law (S. C.) 382; *Wilcox* v. *Parmlee*, 2 Sandf. S. C. R. 610).

In this case, the rate for the whole route was agreed upon by the Illinois Central Railroad Company, but at the same time it was expressly provided in the same instrument that they were not to be responsible for the safety of the cotton beyond the limits of their own road. It is upon the bill of lading alone that the plaintiffs rely for the conclusion that the Illinois Central Railroad Company contracted for the carriage of the cotton to New York, as it contained the names of the consignees there, and the words "through rate $2.00 per 100 lbs." But if the plaintiffs rely upon the bill of lading as the evidence of the contract, they cannot adopt one clause of it and reject the rest. They must take it altogether. It is to be used as one instrument, and the contract is to be gathered from all that is contained in it; and if they reject the bill of lading, then there is nothing in the case but the common-law responsibility of the Illinois Central Railroad Company to transport the cotton to the end of their own route and deliver it there to the next carrier for transit to the place of destination. If, then, we look into the bill of lading at all, we must, in construing the words "through rate, &c.," give full effect to the clause in the body of the bill, that the company were not to be responsible for loss or injury beyond the limits of their own road; and if we do this, the utmost extent of the engagement of the Illinois Central Railroad Company beyond the limits of their own road was to undertake, in delivering the cotton to another carrier, that no

greater rate should be charged for the entire transportation than had been agreed upon, which it appears they provided for, as the Chicago bill of lading which was given by the Union Transportation Company is for its transportation to New York according to the rate of $2 per hundred pounds from Cairo to New York; and it appears that the bills for freight sent by the defendants to the consignees at New York for the freight from Chicago was, accordingly, at the rate of one dollar and forty-five cents.

So far, therefore, as this company are concerned, they fulfilled their contract, both as respects the safe carriage of the cotton by them, and in providing for its transportation beyond their limits to New York at the rate agreed upon.

As by their own agreement with the plaintiffs, their responsibility as common carriers was qualified in certain particulars, it is to be inferred that they had the right to contract upon the plaintiffs' behalf for its further transportation upon the same conditions. The plaintiffs having consented that this company might limit its responsibility, it would not lie with the plaintiffs to object that it agreed that the subsequent carrier to whom it delivered the cotton might transport it upon the same terms.

But, however this may be, it is very clear that they had no power to bind the plaintiffs by entering into other and different stipulations with the subsequent carriers, such as the one to which our attention is now specifically called, namely: that should losses occur under the bill of lading given by the subsequent carriers, the cost or value of the property at the date of shipment should govern in the settlement of the same. In the fulfillment of the further obligation which the Illinois Central Railroad Company owed to the plaintiffs in providing for the transportation of the cotton beyond the limits of their own road, the plaintiffs were entitled to all the security for the safety of their property or for the value of it in the event of its loss which the common law affords, in the extraordinary liability which it imposes upon carriers, except so far, or to the extent to which the plaintiffs had previously agreed to waive it.

It is claimed, however, by the defendants, that the contract

with the Union Transportation Company for the further carriage of the cotton to New York was made with them by the plaintiffs' agent, and that the plaintiffs are consequently bound by the stipulations therein contained.

They rely upon the statement in the Cairo bill of lading that the cotton was consigned to James Warrack, agent, Chicago, and insist that he was thereby made the plaintiffs' agent or consignee at that place to provide for the further transportation of it. But the contract of the Union Transportation Company was not made with him, nor does his name appear in the bill of lading which that company gave. Their bill of lading acknowledges that the cotton was received by them, to be by them transported until it reached the point named in the bill of lading, which is stated in the margin, as follows: " Consigned to Sawyer, Wallace, & Co., New York." The bill of lading was delivered to Warrack, and was sent by him, not to the plaintiffs, nor to Halliday Brothers, who in the Cairo bill of lading are denominated the shippers, but to the Illinois Central Railroad Company.

Testimony was offered by the plaintiffs to show that Warrack was not their agent; that he had no authority to act for them in any respect, and that they did not know him ; to all of which inquiries the defendants objected, and the Judge upon the trial excluded them, and also under the plaintiffs' objection, a statement of the agent of the Union Transportation Company that Warrack acted at Chicago for the shippers, and guaranteed the rate of transportation, which, we suppose, means the agent of the shippers at Chicago, who were, by that bill of lading, the Illinois Central Railroad Company. As Warrack sent the bill of lading to that company, it is fair to presume that they were his principals. It is not stated in the Cairo bill of lading whose agent he was, and if any inference is warrantable upon the whole of this testimony, it is that he was the agent of the company, and not of the plaintiffs.

Assuming then, as I think we must do, that the contract for the transportation of the cotton was· made with the Union Transportation Company by the Illinois Central Railroad Company, and that that company had no authority from the plaint-

iffs to enter into any stipulation as to what should be the criterion of value in the event of losses thereafter, the question arises whether that stipulation is to regulate the measure of damages in an action, not brought against the Union Transportation Company, but against the particular carrier in whose custody the property was at the time of its destruction.

It was held by Justice Nelson, in the *New Jersey &c. Co.* v. *Merchants' Bank* (6 How. U. S. 344), that where the action is brought against an intermediate carrier, who had the custody of the property at the time of its loss, he was entitled to the benefit of a special contract made by him with the original carrier, to the effect that the property was to be carried at the original carrier's risk, and that the intermediate carrier was not answerable for the loss unless it was shown affirmatively that it occurred from the want of ordinary care on his part; that the owner could recover against him only through the special contract which he had made, and that by bringing the action against him, the owner affirmed its provisions so far as they were consistent with the law, which would not uphold a stipulation exempting him from liability for willful misconduct, gross negligence, or the want of ordinary care.

The point that the rights of the general owner, in the event of loss, are controlled by a valid special contract between the carrier employed by him and the carrier in whose custody the property was lost, is to be regarded simply as *dictum*, not being essential to the decision of the case, as the court held that the intermediate carrier was guilty of gross negligence, for which he was answerable to the owner, independent of the contract. It was approved, however, by Justice Duer, in *Stoddard* v. *The Long Island R. Co.* (5 Sandf. 188), though not essential either to the decision that was made in that case, and is treated by Chief Justice Redfield, upon the authority of these two cases, in his recent work upon Carriers (§ 47), as established law.

From the high character of the court in which this *dictum* is found, the learning and great experience of the distinguished Judge by whom it was pronounced, and from the approval of it in the case cited, and in the elementary work referred to, it

is not without diffidence that I call in question its correctness; but I do so from a strong conviction that if, instead of being assumed to be the law, the question had been examined upon the authorities, or the reasons for it had been inquired into, it would not have been so confidently expressed.

It has been repeatedly said that the extraordinary liability imposed upon common carriers by the common law has its foundation in well-considered grounds of public policy (*Coggs v. Bernard*, 2 L. Ray, 909; *Barclay* v. *Gana*, 3 Davy, 389; *Thomas* v. *Boston &c. R. R. Co.* 10 Met. 476; *Hollister* v. *Nowlen*, 19 Wend. 241; *Reaves* v. *Waterman*, 2 Spear, 206; 2 Kent's Com. 602; *Mercantile Insurance Co.* v. *Chase*, 1 E. D. Smith, 131, 132), and this is constantly to be kept in view, whether the action is against the carrier in whose custody the property was lost, or the one with whom the contract was made.

A common carrier has certain obligations and duties imposed upon him from the public nature of his calling. In the language of Justice Nelson, in the case cited, " he is in the exercise of a sort of public office, and has public duties to perform, from which he should not be permitted to exonerate himself *without the assent of the parties concerned.* He is bound to receive and carry all the goods offered for transportation, subject to all the responsibilities incident to his employment, and is liable to an action in case of refusal;" and this has been the law from the Year Books down. If the owner of the goods sees fit to waive any of the conditions which the law has imposed for his protection he may do so, and when he does, he, to that extent, divests the common carrier of his public character; or, if the agreement is, as in *French* v. *Buffalo &c. R. R.* (4 Keyes, 108), at " owner's risk," he makes him in that particular transaction a private carrier, with no greater obligations than an ordinary bailee for hire (*Simons* v. *Low*, 3 Keyes, 220; *Beekman* v. *Shouse*, 5 Rawle, 179; *New Jersey &c. Co.* v. *Merchants' Bank*, 6 How. U. S. 344).

The remedy of the owner is not limited to an action against the carrier with whom he contracted, but he may sue the particular carrier in whose custody and by whose negligence the

property was lost or injured, in which case the action is not
upon the contract, but upon the obligation and duty which that
carrier assumed from the public nature of his employment, and
through the omission or neglect of which the injury is presumed
to have occurred, unless he shows that it arose from the act of
God or the public enemies (*Bretherton* v. *Wood*, 3 Bro. &
Bing. 54; *Green* v. *Clarke*, 12 N. Y. 347; *Cook* v. *Float-
ing Dry Dock*, 1 Hilt. 443; *Arent* v. *Squire*, 1 Daly, 347;
*Allen* v. *Sackridge*, 37 N. Y. 342; *Leslie* v. *Wilson*, 3 Bro. &
Bing. 171; *McCall* v. *Forsyth*, 4 Watts & Serg. 179; *Sander-
son* v. *Lambertsen*, 6 Binney, 129; *Pozzi* v. *Shipton*, 8 Adol.
& El. 963; *Hide* v. *Trent Nav. Co.* 1 Esp. 36; Shearman &
Redfield on Negligence, §§ 14, 111, 112; Angell on Carriers,
§§ 422, 424, 440; Redfield on Carriers, §§ 40, 45; Edwards on
Bailments, p. 466; 1 Selwyn's Nisi Prius, 415, 9th ed.)

In such an action, all that it is incumbent upon the plaint-
iffs to show is that the property was delivered into the custody
of the defendant for transportation in the ordinary course of his
employment as a common carrier, and the fact of its loss or in-
jury, or of the failure to deliver it upon demand.

The contract which was made for its carriage forms
necessarily no part of the plaintiff's proof, though it may
be material on the part of the defendants if it qualified
the first carrier's responsibility, because the subordinate or
continuing carrier should not be held to any greater obli-
gation and duty than was required by the plaintiffs of the
first. Indeed the action upon the contract is of compara-
tively recent origin. Anciently it was upon the obligation
or duty which the common law imposes, or, as the books ex-
pressed it, upon the custom of the realm. Such was the form in
the old book of entries, and the action was an action upon the
case (Hearne, 76; Brownlow Redivivus, 11; Clift. 38, 39; Mod.
Int. 145; *Bretherton* v. *Wood*, 3 Bing. & Bro. 54). " Declara-
tion against carriers in tort," says Bayley, J., in *Ansel* v.
*Waterhouse* (2 Chitty R. 1), "are as old as the law, and con-
tinued until *Dale* v. *Hale* (1 Wils. 281), when the practice of
declaring in assumpsit succeeded, but this practice does not
supersede the other." In *Dale* v. *Hale*, the action was upon the

case, but the declaration was not against the defendant as a common carrier, upon the custom of the realm, but it averred that the defendant at the special instance of the plaintiff undertook to carry the goods. No negligence was shown on the part of the plaintiff, and the defendant was allowed to give evidence that he had taken all possible care of the goods, for which the verdict was set aside, upon the ground that everything is negligence on the part of a common carrier which the law does not excuse, that is, that there may be negligence, though impossible to be detected, making the carrier liable, unless the injury arose from the act of God or public enemies (Angell on Carriers, § 169; *Evarts* v. *Street,* 2 Bail. S. C. 161); and one of the Judges, Denison, said that "the declaration upon the custom of the realm was the same in effect with the declaration in that case, the old form being that the defendant *suscepit,* &c., which shows," he says, "that it is *ex contractu,*" an observation which gave rise to great confusion and to the impression that the action, whether it was in case or in assumpsit, was upon the contract, whereas the true rule is, that it lies independent of any contract, express or implied, upon the public obligation and duty imposed upon the carrier by law (*Merritt* v. *Earle,* 29 N.Y. 122); it being a general principle that where the law imposes a duty upon any one, the neglect of that duty renders him liable to any person who has been injured through the neglect of it. (See the cases collected in *Cook* v. *N. Y. Floating Dock,* 1 Hilt. 443, and *Green* v. *Clarke,* 12 N. Y. 343; *Tattan* v. *Great Western Railway,* 2 El. & El. 844; *Hide* v. *Trent Nav. Co.* 1 Esp. 36; Shearman & Redfield on Negligence, pp. 12, 13; Redfield on Carriers, § 422; Edwards on Bailments, pp. 466, 467).

It follows, consequently, in respect to common carriers, that the action may be for a breach of the contract or for a breach of the duty, and that in the one case it is an action upon the contract, and in the other an action of tort (Jeremy on Carriers, 116, 117; Angell on Carriers, § 422; Redfield on Carriers, §§ 40, 45, 412). If the action is in tort, negligence is presumed, unless the injury arose from causes which excuse the carrier, and which it is for him to show; "for the law," says Chief Justice Holt, in *Coggs* v. *Bernard* (2 Ld. Ray, 909),

" charges the person (the common carrier) thus entrusted to carry goods, against all events but the act of God and the king's enemies," and this applies, whether the action is upon the contract or for the neglect of the duty. It was declared by the Court of the King's Bench, in *Garside* v. *Trent Nav. Co.* (4 T. R. 581), that where goods were received by a carrier to be transported to a place beyond the limits of his own route, that his extraordinary responsibility as carrier ceased at the termination of it, and that his obligation then was simply to forward them by the nearest connecting conveyance. This was a distinction well defined and easily understood; but within the last thirty years a group of cases have been decided in England that have brought this whole subject again into confusion and revived the impression that there is no right of action in the event of loss or injury, except upon the contract. These cases (*Muschamp* v. *Lancaster &c. Railway*, 8 Mee. & Wells. 421; *Scothorn* v. *South Staffordshire Railway*, 8 Exch. 341; *Collins* v. *Bristol &c. Railway*, 11 Exch. 790; 1 Hurl. & Nor. 517 id.; 7 Ho. Lds. Cas. 194; *Wilby* v. *West Cornwall Railway*, 2 Hurl. & Nor. 703; *Mytton* v. *Midland Railway*, 4 id. 615; *Coxen* v. *Great Western Railway*, 5 id. 247), taken collectively, decide that where a railway company books a package for delivery at a point beyond the limits of their own road, and receives the whole sum which is paid for the entire transportation, or agrees that it may be paid when the parcel is delivered at the place of destination, or their agent, when he receives it, signs a paper to the effect that it is delivered into his charge, for a person in a place beyond the limits of their road, that they are liable in their capacity as common carriers for its safe carriage, throughout the entire route, though it may be lost upon a railroad beyond the limits of their own road to whom it has been delivered, and with whom they may have no connection or business arrangement, even though the agent of the owner may sign a way bill declaring that the company receives the charges payable to the other companies for the owner's convenience, and that they are not to be liable for loss or damage occurring upon other railways; or if, when it was lost upon another road, it was in a truck belonging to the company in charge of their guard, which was attached

to the train upon the other road, though the receipt which the company gave for it specified that they would forward it beyond their own line by other carriers, whose charges, for the owner's convenience, would be added to their own, and that when they did so that the delivery on their part was to be complete and their responsibility at an end. That the contract in that case was to be regarded as an entire one to carry the package to and deliver it at the place of destination, and that wherever this was the case no action could be maintained by the owner against the subordinate carrier upon whose road it was lost or injured, but that his remedy was against the company with whom the contract was made. It is proper, however, to say, in respect to the last proposition, that in the case in which it was held (*Mytton* v. *Midland Railway*, 4 Hurl. & Nor. 615; *Coxen* v. *Great Western Railway*, 5 id. 247, and *Bristol &c. Railway* v. *Collins*, 7 Ho. of L. Cases, 194), the action was not brought upon any public obligation and duty, but upon what must be regarded as an averment of a contract between the owner and the intermediate carrier, upon whose road the property was lost, and it may be that the extent of the ruling was that where the contract with the first carrier is for the entire route, no action upon contract can be maintained by the owner against the subordinate carrier, as it was declared by Lord Mansfield, in *Forward* v. *Pittard* (1 T. R. 27), that for a hundred years before his time upon the cases a common carrier was liable *independent* of his contract; that by it he was bound to care and diligence, and liable upon it for negligence; but that there was a *a further degree of responsibility* by the custom of the realm or the common law by which he was held to a responsibility in the nature of that of an insurer, and it is not to be inferred that the court meant by their decision in these cases to gainsay what was declared so positively to be the law by a judge of the eminence of Lord Mansfield.

The American courts, as a general rule, have not gone to the length of these cases in construing a common carrier's liability. While they have rigorously held him to his common-law responsibility when the property was lost or injured in his custody, and, indeed, more rigidly than in the English courts, they have, at the same time, acted upon the more just and rational rule

that his liability is *prima facie* limited to the safe transportation of the property over his own route; that his obligation, then, is to forward it by the usual or most direct conveyance to the place of destination, and to store it, or otherwise to take charge of it until that can be done; that this is the extent of his obligation, though he may give a receipt or sign a bill of lading which names another and more remote point of delivery. He may contract specially for its carriage to and delivery at its final place of destination, and where he tickets it through or takes payment for the whole distance, without any qualification or reservation, it may be inferred that he has made such a contract; but otherwise, his extraordinary responsibility, and the reasons for it, continue only while it is in his own custody, and ends when it is delivered to the next carrier (*Converse* v. *Norwich &c. Trans. Co.* 33 Conn. 166; *Nutting* v. *Connecticut &c. Railroad Co.* 1 Gray, 502; *Detroit &c. Railway* v. *Farmers' Bank*, 20 Wis. 122; *Weed* v. *Saratoga &c. Railroad Co.* 19 Wend. 534; *Farmers' &c. Bank* v. *Champlain Trans. Co.* 23 Vt. 186; *Van Santvoord* v. *St. John*, 6 Hill, 157; *Hood* v. *N. Y. &c. Railroad Co.* 22 Conn. 1; *Penn. Cent. Railway* v. *Schwarzenberger*, 45 Penn. St. 208; *Hunt* v. *N. Y. & Erie Railway*, 1 Hilton, 229; *Krender* v. *Woolcott*, id. 227; *Dillon* v. *N. Y. & Erie Railroad*, id. 231; *Mercantile Ins. Co.* v. *Chase*, 1 E. D. Smith, 115; *Mallory* v. *Burrett*, id. 234).

Regarding it, then, as the law of this country, that an intermediate carrier, in whose custody the property was lost or injured, is answerable to the owner, the question recurs whether he can be allowed to absolve himself, when he receives goods for carriage, of the responsibility incident to the public nature of his calling, by an agreement, not with the owner of the goods, who is the one to be affected in the event of loss, but by an agreement entered into with the carrier from whom he receives the property upon its transit to the place of destination.

It is said, in the marginal note to *Ladue* v. *Griffith* (25 N. Y. 364), and I quote it because it conveys succinctly the view expressed in the opinion. in which the majority of the Judges of the Court of Appeals concurred, that "public policy,

in this country of long routes and frequent transhipment, forbids any intendment which would favor an intermediate carrier in divesting himself of that character, and assuming the more limited responsibility for a forwarder;" or, it might be added, in assuming, at his own election, or with the concurrence of the carriers who deliver him the goods for further transportation, the obligation only of an ordinary bailee for hire. "The carrier at common law," says Justice Smith, in the opinion last referred to, "is an insurer of the goods as against all accidents and perils except such as result from acts of God or a public enemy. Millions of property in value in this country is in the constant possession of carriers engaged in transporting it from one place to another. In this particular it may be truly said that men cast their bread upon the waters expecting to see it again, at a distant point, after many days. Goods are shipped and delivered to carriers by land, at the seaboard, or in the interior of the country, for transportation to distant points, with a simple direction indorsed of the name of the owner or consignee and the place of delivery;" and in a subsequent case (*McDonald* v. *Western Railroad Co.* 34 N. Y. 500), the same Judge remarks "that the vast business of inland transportation of goods in this country is carried on, mainly, by routes formed by successive connecting lines of transit belonging to different owners, each of whom carry the goods over his own line, and deliver them to the next, who, in his turn, takes them on until they reach the final place of destination; that to carriers thus situated, and to goods thus transported, the policy of the common law rule of liability applies with peculiar force. It is a public policy, springing from the public nature of the employment of the carrier, and rendering their good conduct a matter of importance to the whole community."

Should all these intermediate carriers, instead of discharging the duty which is required of them in their public capacity, under the responsibility which the law imposes to secure the faithful performance of it, be permitted to qualify, alter, or change their responsibility as they think proper by agreements among themselves, or by inserting stipulations in the bills of

lading which pass from one to the other in acknowledgment of the receipt of the goods for the purpose of carriage? If they can do it in one particular they can do it in all, and reduce their liability in every case to that of ordinary bailees for hire. If they can do this without the privity, consent, or knowledge of the owner, of what practical value, in a long course of transportation, and over many different routes, is the public rule which imposes upon common carriers the responsibility of insurers? It could be frittered away by printed stipulations on bills of lading delivered to the carrier from whom the goods are received at the end of his route, and who, expressing no dissent, accepts the bill of lading, both as his voucher of the delivery of the property into the hands of the continuing carriers, and as the evidence of the contract made with the carrier for the further transportation of it. Should this be allowed without the concurrence or assent of the owner? Is he to be deprived of the protection which the law affords him for the security and preservation of his property and its due delivery at the place of destination, by the agreements which the carriers along the route enter into among each other, or by the printed conditions of bills of lading which they may see fit to interchange one with the other? How unjust this would be to the owner who surrenders up his property to a carrier for safe carriage and delivery at a point beyond that carrier's route, and which may involve the necessity of its custody by many continuing carriers, may be very well illustrated by the present case, for here the first carrier, The Illinois Central Railroad Company, stipulated, in the bill of lading which they delivered to the plaintiffs or to their agents, that they assumed no responsibility beyond their own route, and that the legal remedy for any loss or damage should be against the particular carrier or forwarder in whose custody the property actually was at the time of the happening thereof. For any loss or damage, therefore, that might happen to the property after they had parted with the custody of it, no recourse could be had against them, and this being the case, are they to be allowed to bind the plaintiffs by making special contracts with the carriers to whom

they deliver it for further transit, which take away or lessen those obligations which the law has imposed for his protection and that of all who entrust their property to common carriers? If this were so, every carrier through whose hands the property passes might impose his own terms and conditions; and when the owner sought his remedy against the carrier who had the custody of the property when it was lost or injured, and who in this case would be the only one who would be answerable to him, he might be met by a special contract, which he knew nothing about, absolving that carrier from all liability unless the owner could prove how the loss happened, and that it occurred through the carrier's negligence. In the printed part of many of the bills of lading of carriers which I have seen in the trial of causes, there has been a clause that the carriers were not to be responsible unless it could be shown *affirmatively* that the loss or damage occurred through the negligence of the carrier or his agents, thus imposing upon the owner, who may be living thousands of miles away, the obligation, before he could venture upon his action, of ascertaining exactly how the loss or injury happened, which in most cases would be difficult, and in many impossible. One of the very reasons for the extent of the liability of common carriers, as was said by Lord Mansfield, in *Forward* v. *Pittman* (1 T. R. 33), is "to prevent" the necessity of going into circumstances impossible to be unravelled; "and therefore," he says, "the law presumes against the carrier, unless he shows that the injury was done by public enemies, or by such act as could not happen by the intervention of man, as storms, lightning, and tempests."

It has been repeatedly held that a common carrier cannot, by a special acceptance, or by simply delivering a receipt or bill of lading containing stipulations to that effect, qualify his common-law ability (*Mercantile Ins. Co.* v. *Chase*, 1 E. D. Smith, 138; *Buckland* v. *Adams Express Co.* 97 Mass. 132; *Fish* v. *Chapman*, 2 Kelly, Ga. 357; *Judson* v. *Western R. Co.* 6 Allen, 486; *Southern Express Co.* v. *Newby*, 36 Ga. 635).

The owner may agree to exempt the carrier from all or any part of his responsibility. It may be the owner's interest to do so. He may be willing, in consideration of paying less than

the ordinary rate, to take upon himself exclusively the risk of loss or damage in the carriage of the goods, and discharge the carrier from all liability therefor; but it must be shown that he expressly agreed to do so. His assent is not to be implied because a receipt or bill of lading has been delivered to him, with printed stipulations qualifying the carrier's liability. He is under no obligation to read them over and point out what he dissents from, or declare that he dissents from the whole of them, at the peril otherwise of being concluded or bound by them. He may remain entirely passive, as he has the right to hold the carrier to the full extent of his common-law responsibilities, whilst the carrier has no right, upon his part, to impose any other or different conditions.

Indeed, it is difficult to see how the owner's assent can be assumed unless he signs some memorandum or agreement in writing, or expresses it by some affirmative declaration *or act*, or it is shown that, in consideration of his taking the risk, the goods were to be carried at a lower rate than it was customary to charge, which, possibly, may be inferred where, as in *French* v. *Buffalo &c. R. Co.* (4 Keyes' R. 108), the significant words "owner's risk" are written across the face of the receipt or bill of lading.

If the carrier, then, cannot bind the owner by stipulations in the receipt or bill of lading which he gives when he receives the goods from him for carriage, it is very clear that an intermediate carrier cannot bind the owner by delivering a receipt embodying such stipulations to the carrier from whom he receives the goods in their transit for carriage over his route. He may refuse to receive them, it has been said, unless he is paid in advance for their carriage (*Mercantile Ins. Co.* v. *Chase*, 1 E. D. Smith, 124); but if he takes them, he can take them *only* under and subject to his common-law responsibility, which falls upon him the moment they are delivered into his custody (Angell on Carriers, §§ 129, 356; *Grosvenor* v. *N. Y. Central R. R.* 39 N. Y. 34; *Michaels* v. *N. Y. Central R. R.* 30 N. Y. R. 564; Story on Bailments, § 533).

That responsibility he cannot vary or alter by a special acceptance, or by the delivery of a bill of lading—a receipt con-

taining terms and conditions—nor can he, in my judgment, by a special agreement with the carriers from whom he receives the goods, unless it is shown that the carrier had authority from the owner to make such an agreement. "A man bound to any duty by operation of law," said Lord Kenyon, in *Hide* v. *The Trent Nav. Co* (1 Esp. 36), "cannot, by any act of *his own*, discharge himself; and he gives as an illustration the case of the carrier; to which, it may be added, nor can one carrier by an agreement with another discharge himself from the responsibility which the law imposes, and deprive the owner of the goods carried of what is in effect a public regulation, which the owner alone has the right to dispense with.

No other view than this will afford that protection to the owner which it was the object of the common law to secure, or prevent the rule it has laid down from being impaired by the ingenuity and contrivances of carriers; and in respect to the necessity of maintaining the rule in its integrity, it may be well to keep in mind the observation of Chancellor Kent upon its establishment in England, that it had its foundation "in a great principle of public policy, which has proved to be of eminent value to the morals and commerce of the nation in succeeding generations" (2 Kent's Com. 602).

I shall hold, therefore, in this case, (1) that the intermediate carrier cannot avoid the public responsibility, which he is under to the owner, to carry the goods in safety, and subject to all the obligations and conditions which the law imposes, by a special agreement entered into with the carrier from whom he receives them, unless it is shown that the carrier had authority from the owner to make such an agreement. (2) That the intermediate carrier is entitled to the benefit of any agreement entered into by the owner with the first carrier qualifying or limiting the common-law responsibility, and will be regarded as taking the goods for carriage, upon the same conditions and subject to the limitations or exemptions that exist in that agreement; and (whether I am right or not in the first of these propositions) that no special contract for additional limitations was made on the part of the Union Transportation Company, by simply delivering a receipt with such conditions printed upon

it, to the agent of the Illinois Central Railroad Company, when the goods were received for carriage, which is all that there is in this case to support the assumption of a special agreement that the value of the property at the place of shipment was to govern in the event of loss, instead of at the place of 'delivery, the latter being the equitable and just rule which the law imposes.

The Union Transportation Company contracted for the carriage of the cotton from Chicago to New York, and whether the defendants, the Camden & Amboy Railroad and Transportation Company, in whose custody it was destroyed by fire, are to be regarded as the agents of the Union Transportation Company, or as a subordinate or connecting carrier, can make no difference as respects their liability to the plaintiffs.

As subordinate or connecting carriers they were entitled to the full benefit of the accepted risks contained in the Cairo bill of lading, and have received it upon the trial and in the decision previously made in this case. By the bill of lading a loss by fire was one of the perils from which the carriers were to be exempted. No recovery could therefore be had against the defendants, unless the plaintiffs could establish that the loss was occasioned by their negligence, which the plaintiffs succeeded in doing, by showing that the cotton was destroyed by a fire upon the defendant's premises, the defendants failing, or being unable to show how the fire originated, and the jury finding, in the absence of satisfactory explanation, that it was from the want of proper care and diligence. Of their liability as intermediate carriers to the plaintiffs for a loss occasioned by their negligence, there is not the slightest doubt upon the authorities already referred to, both in this and in the former opinion. The complaint, it is true, sets up a contract between the plaintiffs and the defendants, but it also avers that they so negligently conducted and misbehaved in their calling as carriers, that the cotton was never delivered to the plaintiffs, but was wholly lost to them.

This is an averment of negligence, and if the complaint is defective in setting up also a contract between them and the plaintiffs, the court can and will, after verdict, and in further-

ance of justice, so amend the complaint as to confirm the pleading to the proof.

They are not entitled to the benefit of the clause inserted in the Chicago bill of lading, with the design of substituting a different rule from that which the common law declares shall regulate the measure of damages, for the reason already given that no contract of that nature was made by the Union Transportation Company, delivering to the agent of the Illinois Railroad Company a receipt or bill of lading embodying a printed stipulation to that effect, nor in my judgment could have been made so as to bind the plaintiffs, unless they had conferred the authority.

The judgment must therefore be affirmed for the whole amount of the verdict.